Argued December 16, 1926, affirmed February 8, argued on re-hearing April 20, former opinion sustained June 21, 1927.

## A. C. CRAWFORD v. COBBS & MITCHELL CO.

(253 Pac. 3; 257 Pac. 16.)

**Waters and Watercourses—Sawmill Operator Held Entitled to Impound Waters to Full Height of Dam.**

1. Corporation operating sawmill near headwaters of river had right to erect and maintain a dam in connection therewith and to impound water therein to its full height.

**Waters and Watercourses—Owner of Dam Could Rightfully Permit Flood Waters to Pass Over Dam in Quantities Flowing into It.**

2. Corporation maintaining dam in connection with its sawmill near headwaters of river had right to permit flood waters to pass through or over it in such quantities as flowed into it.

---

1. Right to detain water for purpose of furnishing water for a mill, see note in 41 L. R. A. 747. See, also, 27 R. C. L. 1112.

Waters and Watercourses—Owner of Dam Could not Rightfully Re-
lease Water in Excess of Normal Flow.

3.   Corporation impounding water in dam had no right to release
it in larger quantities than were flowing into dam from above, so
as to add to normal flow of water in river.

Waters and Watercourses—Owner of Dam Releasing Large Quan-
ties of Water in Addition to Flood Water is Liable to Lower
Riparian Owner for Damages.

4.   Corporation suddenly releasing large quantities of water in
addition to flood water coming into its dam near headwaters of
river is liable for damage to lower riparian owner caused solely by
water so released or concurrently with flood water going down.

Waters and Watercourses—Whether Owner of Dam Released More
Water Than Flood Water Held for Jury.

5.   Whether corporation, sued for damage to property by over-
flow of plaintiff's land, released more water through gate of its dam
near headwaters of river than flood water flowing into pond, *held*
for jury.

Waters and Watercourses—Whether Release of Water Impounded
by Dam Contributed to Damages by Overflow Held for Jury.

6.   Whether corporation's sudden release of waters impounded by
its dam near headwaters of river was contributory cause for damage
to property by overflow of lower riparian owner's land *held* for jury.

Waters and Watercourses—Whether Release of Impounded Waters
Caused Overflow of Land Below Dam Held not Merely Specu-
lative.

7.   Whether release of water in addition to flood waters from dam
near headwaters of river caused damage by overflow of lower ri-
parian owner's land *held* not merely speculative because of general
storm over entire watershed, swollen streams below dam, and slide
of several acres tending to divert water from its usual channel.

Evidence—There can be No Verdict Based on Exact Balance of
Equally Probable Causes of Injury.

8.   Where it is just as probable, on the face of it, that one cause
produced injury as another, there can be no verdict based on exact
balance of probabilities.

ON REHEARING.

Evidence—Jury may Accept or Reject in Whole or in Part Testi-
mony of Any Witness.

9.   The jury, having the duty to weigh the testimony, has power
to accept or reject in whole or in part the testimony of any witness.

Waters and Watercourses—Whether Flood Waters Pass Over Dam or
Through Headgate is Immaterial, Where Discharge Does not
Exceed Inflow.

10.   Where the waters passing from a dam are not greater than
those flowing into it, so that the level of the mill-pond remains the

3.   See 27 R. C. L. 1112, 1113.
9.   See 28 R. C. L. 658.

same or is increased, it is immaterial, in determining the dam owner's liability for damages caused by flood waters to a lower riparian owner, whether the water passes over the dam or through an open headgate.

**Waters and Watercourses—Owner of Dam may Rightfully Release More Water Than Flows into It, if Man of Ordinary Prudence Would Do Likewise.**

11. Owner of a dam may rightfully permit flood waters to pass over the dam and through the headgate in quantities exceeding the flow into the mill-pond, if a man of ordinary prudence would do the same thing under like circumstances.

**Trial—Court must Consider Evidence Most Favorable to Plaintiff on Defendant's Motions for Nonsuit and Directed Verdict.**

12. In passing on defendant's motions for nonsuit and a directed verdict, the court must consider all competent evidence of record in the light most favorable to plaintiff, not only deeming the plaintiff's testimony true, but giving to it the benefit of every intendment and reasonable inference that can be drawn therefrom.

**Trial—Case is for Court, Where Evidence is Free from Conflict and Susceptible of but One Conclusion.**

13. Where evidence is free from conflict and is susceptible of but one conclusion, the case is for the court.

**Trial—Case is for Jury, Where More Than One Conclusion can be Drawn from Facts (Const., Art. VII, § 3c).**

14. Where more than one conclusion can be drawn from the facts, the case is for the jury, under Constitution, Article VII, Section 3c.

---

Appeal and Error, 4 C. J., p. 763, n. 59, p. 764, n. 60, 61, 67, 68, p. 765, n. 85, 91, 93, p. 848 n. 35, p. 854, n. 70, p. 861, n. 24.

Juries, 35 C. J., p. 232, n. 24.

Trial, 38 Cyc., p. 1516, n. 57, p. 1517, n. 62, p. 1518, n. 69, p. 1521, n. 84, p. 1534, n. 34, p. 1537, n. 45, p. 1539, n. 46, p. 1540, n. 47.

Waters, 40 Cyc., p. 571, n. 47, p. 572, n. 49, p. 666, n. 85, 86, p. 667, n. 89 New, p. 669, n. 11, 12, p. 682, n. 26, 30 New, p. 690, n. 1, p. 691, n. 4.

From Lincoln: GEORGE F. SKIPWORTH, Judge.

In Banc.

This is an action to recover damages for injuries to property owned by plaintiff consisting of cattle, hogs, chickens, hay, oats, fences, etc., which, on November 21, 1921, were located on land owned and occupied by the plaintiff along the border of the Siletz River.

The defendant operated a large sawmill near the headwaters of the river. In connection therewith defendant had constructed and used a dam for the purpose of forming a large pond for the handling of its logs. Said pond included an area between five and six hundred acres. The dam was 42 feet in height, 200 feet in length and was equipped with a flood-gate 18 feet in width and of the depth of 18 to 20 feet.

On Sunday, November 20, 1921, while the river was at flood stage and still rising, and while the pond was overflowing the dam for at least a portion of the way, the defendant opened the gate of the dam and permitted the water in the pond to flow down the river thereby, according to plaintiff's contention, overflowing the banks of the stream and the lands occupied by plaintiff some 40 miles below the dam and washing and damaging plaintiff's property.

Trial before a jury resulted in a verdict and judgment against the defendant from which this appeal is taken. Further facts will appear in the opinion.

AFFIRMED.

For appellant there was a brief over the names of *Messrs. McCamant & Thompson* and *Mr. C. L. Starr,* with an oral argument by *Mr. W. Lair Thompson.*

For respondent there was a brief over the names of *Mr. Oscar Hayter, Mr. Arthur Clarke* and *Mr. G. B. McCluskey,* with oral arguments by *Mr. Hayter* and *Mr. Clarke.*

McBRIDE, J.—While the testimony is in some respects indefinite and others contradictory, and while much space is occupied with presenting the law in this case, there is really but one question for decision,

and that is, whether there was any substantial evidence to justify the verdict in this case.

1–4. The following principles of law may be taken as well established. First, as applicable to this case, that the defendant had the right to erect and maintain its dam at the place where it was constructed and to impound the water therein to the full height of the dam. Second, that it had, in case of a flood or unusual high water, the right to permit flood waters to pass through or over the dam in such quantities as flowed into it. Third, that they had no right, after having impounded the water, to release it in larger quantities than were then flowing into it from above thereby adding to the normal flow of waters so released by their act in raising the flood-gate. Fourth, that if, in addition to the normal flow, defendant, by suddenly releasing large quantities of water in addition to the flood water then coming into its dam, caused damage to the plaintiff either solely by the water so released, or concurrently with the flood water which was going down, it is liable for such damage.

The evidence indicates that there was a tremendous and unusual storm extending not only over the basin of the Siletz River, but generally over the county of Lincoln. It is fair to say that the storm and rise of the water caused by the rainfall, if not unprecedented, at least, had no precedent within recent years as is shown by the fact that bridges not only on the Siletz River, but on other streams remote from the Siletz basin, were also carried away and more or less damage done to property upon the banks of such streams.

5. The plaintiff labored under the difficulty of having to present its case upon the testimony of wit-

nesses then or theretofore in the employ of the
defendant, and presumably not particularly anxious
to communicate voluntarily any fact which might be
of injury to defendant's case. The defense of de-
fendant is that at the time of opening the gate, it
released no more water than was coming in from
above and that if that was the case, the court should
have directed a verdict for the defendant as the bur-
den of proof was upon the plaintiff to show that de-
fendant released more water through its gate than
the flood waters flowing into the pond. While the
testimony on this point, on behalf of plaintiff, is far
from being wholly satisfactory, we are of the opinion
that there was testimony enough to entitle the case to
go to the jury. If, as claimed by defendant, the dam
was already full and the water overflowing, there
could be no reasonable necessity for opening the
flood-gate and allowing the water to escape through
it. Having reached, according to this theory, the
point where the flood waters would pass over the
dam, there could be no further danger to the dam
or other mill property by reason of the water flow-
ing in from above.

6. It seems plain, from the circumstances of the
case, that the object of raising the gate was not there-
fore to permit the flood waters going into the pond to
escape, but to permit flood waters already accumu-
lated in the pond likewise to escape for defendant's
own convenience or safety to its buildings, and that
the plaintiff had a right fairly to infer that, in addi-
ton to the flood waters passing over the top of the
dam, the defendant, by the act of suddenly raising
the gate, set free a tremendous amount of water,
which had accumulated in the dam and which neces-
sarily and suddenly increased the flow in the river

below. While the exact amount of the rise from this cause is not capable of mathematical calculation, it was for the jury to say, under all the circumstances, whether this contribution of impounded water was a contributory cause to the injuries suffered by plaintiff.

It stands to reason that an opening 12 by 18 feet, which is the minimum fixed by the witnesses in a pond of water containing 600 acres and 40 feet in depth at the head of the dam, was competent to have produced the cause of the accident, or, at least, that it was fairly probable that the injury was produced by the acceleration of water in the bed of the stream below the dam rather than by other causes which will be hereinafter mentioned. It seems from the evidence that the rise, while all of the time during Saturday and Sunday was rapid, within a few hours after the flood-gate was raised it rose with very great suddenness, which renders it fairly probable that the water rushing through the flood-gate out of the dam was a contributory cause of the sudden rise in the river below and the consequent injury. An incident occurring after that on the 25th of November tends to throw some light upon the effect of suddenly opening the flood-gate. On that day the same gate, which was opened on November 20th, broke and went out, allowing the impounded water to rush down the river below and that too while there was little rain on that date. And further, that several hours after the going out of the gate the water below the Siletz agency rose from eight to ten feet without any apparent cause excepting the breaking out of the gate. Assuming that a like effect and a like quantity of water flowed out on November 20th, it furnished some proof upon which a jury had a right to act as to the effect

of the water so released on the 20th upon the height of the water below.

7. It is contended, however, that the storm being general over all the Siletz watershed, and by reason of several streams below the dam being at a highly swollen stage of water, and the jury being unable to differentiate the various factors entering into the unprecedented rise of the Siletz, it amounted to a mere speculation as to whether the opening of the dam was a factor in the injuries produced. Evidence is also introduced of a slide of several acres, which it is contended has a tendency to divert the water from its usual channel over and against the land or premises of the plaintiff. It is claimed that this is another factor in assuming the cause of damage which reduces the consideration of these facts by the jury to mere speculation. But all of these matters, of course, were proper questions for the jury, and we do not think the consideration of their effect was wholly speculative, or that it reduced the question of what particular cause produced the injuries to plaintiff's property to a matter of mere speculation.

8. Of course, in cases where it is just as probable, on the face of it, that one cause was as likely to have produced the injury as another, there can be no verdict based upon an exact balance of probabilities, which would reduce the verdict to mere guesswork or chance, but we think, taking into consideration all the facts, that there was evidence competent to go to the jury tending to show that the most probable cause of the injury was the sudden release of impounded water from the dam, and that this is not a case in which the court should have directed a verdict. The temptation is great to give the whole testimony in the

case, but it would unnecessarily enlarge the scope of this opinion and be of little value to the profession.

The judgment of the Circuit Court is affirmed.

AFFIRMED.

BELT, J., not sitting.

———

Former opinion sustained on rehearing June 21, 1927.

ON REHEARING.

(257 Pac. 16.)

Defendant appealed from a judgment for $3,110, recovered in a trial by jury. The case was affirmed by this court. (For opinion, see 253 Pac. 3.) The defendant filed a petition for rehearing, urging "a re-examination only as to one point." This point involves the sufficiency of the evidence.

FORMER OPINION SUSTAINED.

For appellant there was a brief over the names of *Mr. C. L. Starr* and *Messrs. McCamant & Thompson,* with an oral argument by *Mr. W. Lair Thompson.*

For respondent there was a brief over the names of *Mr. Arthur Clarke, Mr. Oscar Hayter* and *Mr. G. B. McCluskey,* with oral arguments by *Mr. Clarke* and *Mr. Hayter.*

BROWN, J.—The plaintiff, a lower riparian owner, brought an action for damages against the defendant company, an upper riparian proprietor, for loss sustained by plaintiff in his personal property, arising out of defendant's alleged negligence in the discharge of impounded waters through its dam. The defendant company is the operator of a sawmill located near the headwaters of the South Fork of the Siletz River, in Polk County. In carrying on its busi-

ness, it maintains a large reservoir for floating logs, formed by constructing a dam 20 feet in length and about 40 feet in height. The reservoir thus formed, when filled with water, creates an artificial lake at least 500 acres in area.

The evidence shows that, on Sunday, November 20, 1921, the reservoir was full and the water was flowing over the dam, to a depth at one point of about one foot, and that the superintendent of the company, in order to lower the water in the reservoir, decided to release a portion of the impounded water through the gateway of the dam. This gate was about 18 by 18 feet. After working about two hours, some of the defendant's employees raised the gate six feet, but, upon being told by the superintendent that this was unsatisfactory, they raised it an additional six feet or thereabouts, thus permitting about 12 by 18 feet of water to escape into the channel of the river.

Plaintiff contends that the defendant released impounded waters in such quantities that it augmented the natural flood waters to the extent that it caused the damage to plaintiff's property alleged in the complaint. There is evidence of record that proves beyond peradventure that the freshet described in defendant's pleading was the natural result of an extraordinary rainfall and the watershed of the Siletz River.

That an upper riparian proprietor who has impounded the waters of a stream may release impounded flood waters through his dam without liability to a lower owner, provided he does not swell the natural flow of the stream below the dam to the damage of the lower owner, admits of no dispute: *Weiss* v. *Oregon Iron & Steel Co.,* 13 Or. 496 (11 Pac.

255); *Teeter* v. *Nampa & Meridian Irr. Dist.*, 19 Idaho, 355 (114 Pac. 8).

The writer pauses to observe that the evidence might have supported a finding by the jury to the effect that the volume of water sweeping down the Siletz River was so great that the plaintiff would have been injured even though the gateway had remained closed. However, the jury having found to the contrary, the question before us does not involve the weight or preponderance of the evidence, or the credibility of witnesses. The question is: Does a search of the record disclose some competent evidence in support of the material allegations of the complaint? We are required to heed the fundamental law of this commonwealth, reading:

"The right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict." Or. Const., Art. VII, § 3-c.

This language is too plain in statement, and too clear in meaning, to admit of construction or interpretation. It explains itself. A trial by jury is a trial by jury. It is not a trial by the court. The fact in controversy relates to the defendant's alleged negligence in releasing impounded waters in such a quantity that the volume of water flowing down the river was greater than that flowing into the reservoir; and the case was given to the jury upon the theory that the company had no right, under the then existing conditions, to open the flood-gate of the dam to such an extent that it permitted the impounded water to flow downstream from the dam in a quantity greater than that supplied to the reservoir by nature.

Joseph Mortimer, an employee of defendant, testified that, when he was at the dam on Sunday morning, the water was running over the top, and that he, with others, under the direction of defendant, raised the gate six feet after working two hours in the attempt; that they then started back to the mill and met Mr. Powell, the superintendent, on the way. He further testified:

"He (the superintendent) said the water was still raising very rapidly up above, and we would have to raise it(the gate) higher. * *

"Q. How much did you raise the gate at that time? A. Well, I don't remember how much we raised it, but as near as I can remember we had it about, we figured, as much again as—as much as we had in the forenoon.

"Q. It would be about six feet more? A. Four to six feet more, something like that."

Witness testified that, when he reached home that afternoon, the water was much higher, probably "a couple of feet" higher, than when he had left in the morning, and that, when he saw the mill-pond the following morning, the water had fallen.

Huron Briggs, an employee who was at the company's dam when the water was running over the south end of the dam, testified:

"Q. When you opened the gate, how did the stream below compare with what it was when you got up there that morning? A. Well, naturally a good flow of water went out of there. It filled right up to a certain extent. * *

"Q. Could you form an idea to what extent the raised flow of the river below the dam as compared with the stage you say was—comparable with the water showing in the picture? A. Well, I should have thought it raised it right there about 4 feet."

He further testified that the flow of the water "was pretty rapid. * * It roared considerably." He swore that, upon meeting Superintendent Powell after the gate had been partially opened, the superintendent, "said the water had not gone down like it should have, and we will have to go back and open it again—further—he asked how far we had opened it, and we told him and he said that."

Superintendent Powell testified:

"Q. Well, the water was flowing over the top of the dam? A. Yes, sir. * *

"Q. Now, you would not be impounding water after it once reached the level of the dam, would you? A. No, sir, I don't see why I should flood those houses and farms back there, why not let the water go on? * *

"Q. And you opened the gate in order to lower the water, didn't you? A. Yes, sir."

A circumstance of some weight tending to strengthen the plaintiff's case arises from the fact that the flood-gate of the dam was broken on Friday following the freshet, thus permitting the impounded waters to escape from the reservoir, and causing the river to rise eight or ten feet, at which height it remained for about three days. Witness Elmer Deetz testified, concerning the stage of the water, that he crossed the Siletz River about 9 o'clock on Friday morning after the freshet, and that, about noon the next day, the river was eight or ten feet higher than on the preceding forenoon though there had been no rain "to speak of at all; very light rain, if any." He further testified that he thought it took the impounded waters about three days to run out. Water was likewise poured into the channel of the river through the same gate during the freshet.

9. That the plaintiff sustained injury from the overflow of his land and the drowning of his livestock by the flood waters is established beyond question. But, as to whether he was injured in his property by reason of the negligence of the defendant is, in the mind of the writer, a grave question. If there was no evidence in the case from which the jury could properly find that the defendant was negligent as alleged, in releasing the impounded water through the dam, then the court should have granted defendant's motion for a nonsuit. But, in the consideration of the testimony as a whole, which includes not only the oral declarations of the witnesses, but the exhibits showing the topography of the country, we find that there was some evidence in support of each of the several material allegations of the complaint. As we have pointed out, under our system of jurisprudence it was the duty of the jury to weigh the testimony and determine the credibility of the respective witnesses, and to determine where the evidence preponderated. Under the rules of evidence, the jury had the power to accept, or to reject, in whole or in part, the testimony of any witness. The jury likewise had a right to infer from the evidence that the defendant released the impounded waters of its artificial lake for the purpose of lowering the waters of the reservoir, and that, in accomplishing its purpose, it acted negligently, and to the injury of plaintiff. We have seen that the company, through its superintendent, directed the opening of the gateway in the dam. In obedience to his order, the gate was elevated about six feet. Soon thereafter the superintendent, observing that the water was yet rising in the reservoir, directed that the gate be further opened. It was then elevated to a height of approximately twelve feet, thus

permitting a quantity of water 12 by 18 feet under pressure to pour into the river below the dam, and augmenting the flow of that stream. The superintendent seems to have been satisfied that, by elevating the gate 12 feet, his desire to lower the water in the reservoir was accomplished. However, he testified that the waters in the reservoir were never lowered below 11.51. Notwithstanding the testimony to the contrary, the jury doubtless found from the evidence that the volume of water flowing down the South Fork of the river below the dam was greater than the volume flowing into the artificial lake.

10, 11. The defendant's legal rights were carefully protected by the charge of the court. Among its instructions, the court thus charged the jury:

"Defendant was under no obligation to impound or hold behind its dam any water naturally flowing into the mill pond on November 20, 1921, or at any other time. Such water would be the natural flow of the stream at the time, regardless of whether the stream was at flood stage, and defendant could permit it to flow past the defendant's dam without liability for any damage caused thereby.

"If you find from a consideration of all the evidence that the amount of water in defendant's reservoir was not reduced on November 20, 1921, and prior to the damage claimed by plaintiff, but if the level of the water in the mill pond remained the same, or increased during the day, the plaintiff cannot recover. It would be immaterial whether the water passing defendant's dam went over the dam or through the headgate which defendant opened.

"If you find that the defendant released from its mill pond an amount of water greater than was flowing into said mill pond, but you further find that a man of ordinary prudence would have done the same thing under like circumstances, your verdict would be for the defendant."

The instructions to the jury were clear.

12-14. In passing upon defendant's motion for a nonsuit, we are governed by the rule of law which requires the court to consider all competent evidence of record in the light most favorable to plaintiff. This statement of law applies alike to defendant's motion for a directed verdict. In the consideration of such motions, not only must we deem plaintiff's testimony to be true, but we must give the plaintiff the benefit of every intendment and every reasonable inference that can be drawn therefrom. Where the evidence is free from conflict, and is susceptible of but one conclusion, the case is for the court. On the other hand, if more than one conclusion can be drawn from the facts, the case is for the jury: *Galvin* v. *Brown & McCabe,* 53 Or. 598 (101 Pac. 671); *Thienes* v. *Francis,* 69 Or. 165 (138 Pac. 490); *Hartford Fire Ins. Co.* v. *Central R. R. of Oregon,* 74 Or. 144 (144 Pac. 417); *Herrick* v. *Barzee,* 96 Or. 357 (190 Pac. 141); *Collins* v. *United Brokers Co.,* 99 Or. 556 (194 Pac. 458); *Farrin* v. *State Industrial Acc. Com.,* 104 Or. 452 (205 Pac. 984), and the local cases there cited.

The former opinion is sustained.

FORMER OPINION SUSTAINED.

RAND, J., dissents.