Vaughan, J.
This is an appeal by the State of New York from an award of the Court of Claims of the sum of $1,000 in favor of claimants for damage to their property located in the city of Rome, New York, caused by the overflow of the Mohawk River on October 2, 1945. It is the contention of the claimants that the flooding of the premises was occasioned by the negligence of employees of the State of New York in the operation of the Delta Dam Reservoir in that they failed to maintain the water in the reservoir at a level sufficiently below the top elevation of the spillway to hold back additional water coming into the reservoir occasioned by excessive rain, and permitting the discharge of water into the Mohawk River in such an amount as to cause the overflow of its banks.
The defendant, State of New York, in 1910, pursuant to chapter 147 of the Laws of 1903, constructed at a point about seven miles north of the city of Rome, New York, what is known as the Delta Dam across the upper Mohawk River. Its purpose was to create a storage reservior to supply water as needed to the summit level of the Barge Canal. The dam structure consisted of a concrete wall some 1,300 feet in width and 100 feet in height with a spillway about 300 feet in width. The impounded water is discharged from the dam into the Mohawk River channel either by means of discharge pipes located at the Pase ot the dam or from the spillway when the water is at spillway height. The river channel extends from the dam to the Barge Canal. The State takes the position that there was no *649 legal duty imposed upon it to operate the dam for flood control purposes and in any event that the flood damage would have occurred regardless of the presence of the dam.
Liability of the State asserted by claimants is predicated, not upon negligence with respect to the maintenance of the river channel, but rather upon the theory that having the means to draw down the impounded water, it was the duty of the State to do so to the end that the water level should be kept below the spillway level so that 11 a portion of any heavy rainfall ’ ’ would be retained in the reservoir and not discharged into the river in such an amount as to cause the river to overflow its banks. Stated simply, claimants’ theory is that by building the dam the State assumed, in some way, a duty of making conditions better for lower property owners than they would have been if no dam had been constructed.
There can be no question that if the water in the reservoir had been drawn down sufficiently far, the dam could have held back all the additional water occasioned by the excessive rain of 3.81 inches which occurred October 2, 1945. However, we know of no authority and none has been called to our attention which imposes any such duty upon the State nor has any case been cited which imposes such a duty upon a private individual or a corporation. If there was some duty, either statutory or at common law, on the part of the State to regulate the outflow of water from the dam so as to minimize or eliminate the flooding of lands below to an extent greater than would be the case if the river flowed naturally, then a negligent omission to perform the duty of such regulation would sustain an action for damages. We find no such duty. The dam was authorized and is intended as a storage reservoir for the purpose of supplying water to the Barge Canal. The funds used for its construction were authorized solely for the improvement of the canal system and not for flood control purposes. There being no statutory duty to operate the dam for flood control purposes, any duty to operate the dam for the purpose of bettering natural conditions must be found in some rule of the common law which would be applicable to a private individual or a corporation. We know of no" principle of common law which imposes any such duty.
In this case, there is no breaking of the dam, no sudden and unwarranted opening of sluice gates, no seepage of water and no artificial channels. We simply have the question as to whether a dam owner has the right to let nature take its course, i.e., the right to permit flood waters to go over his dam *650 where the volume of water cast into the channel helow the dam does not exceed the volume coming in above the dam. We think the question must be answered in the affirmative.
In Stone v. State of New York (138 N. Y. 124, 130), the court laid down the rule in a flood damage case caused by the giving way of a guard bank alongside an artificial channel that “ While it is possible that if the guard bank had been maintained in repair it would have confined the water to the new channel, the state was under no obligation to maintain it to protect land which would have been flooded to the same extent if the improvement had not been made.” (Emphasis supplied.)
In Wegenast v. Ernst (8 Upper Canada Common Pleas Rep. 456), plaintiff sought to recover damages to his mill dam located downstream from defendants’ dam. It was plaintiff’s contention that his dam was washed away when defendants raised their flood gates permitting an unusual quantity of water to flow with great force against his dam. It appeared from the evidence that it had rained heavily the day before and during the night when the gate was raised, apparently for the purpose of relieving the pressure on defendant’s dam. Plaintiff obtained a verdict at the Trial Term which was set aside upon appeal, the court stating in part: “ There appears to have been a heavy rain, and an increased flow of the stream would naturally result from this cause, and whether defendants opened their gate ten inches or fifteen inches, would not give the plaintiff a cause of action, because his dam was washed away by the water thereby suffered to flow down, unless a larger quantity than would, from natural causes operating at that time, have gone down the stream was let off from the defendants’ pond into the plaintiff’s. * * * That there was an increased flow of water occasioned by heavy rain, seems established by the evidence on both sides, I gather also, that such an increased flow, one which would (as some evidence seems to prove it did) raise the water over so large a surface as that of the defendants’ pond in a very few hours, must have been considerable, and may have been, though the defendants let no more off than the increased natural flow, the cause of the injury. Now, the plaintiff had to guard against any flow of water which proceeded from natural causes. In other words, so long as the defendants let down no more from their pond than natural causes brought into it, and at no faster rate than natural causes were at the time supplying it, they would not be liable.” (Emphasis supplied.)
Ireland v. Henrylyn Irrigation District (113 Col. 555) was an action for damages for the destruction of plaintiff’s dam *651 alleged to have been caused by the negligent operation of defendant’s storage system located upstream from plaintiff’s dam. The basis of liability asserted by plaintiff was the lowering of the spillway height and the widening of the spillway area in time of flood, thereby increasing the water flowage from the dam causing damage to plaintiff. The defendant had judgment at the Trial Term which was thereafter affirmed upon appeal. In the course of its opinion, the court uses this language : “ We are of the opinion that plaintiff could not acquire a right against defendant to have a system of flood control in storage works located above his property that would be any better than if defendant’s reservoir had never been built. The object of the statute is to protect persons owning property below reservoirs from having their situation worsened, and not to have it improved.” (Pp. 558-559.)
In Crawford v. Cobbs & Mitchell Co. (121 Ore. 628) an action was brought to recover for flood damages alleged to have been caused by the negligence of the defendant in opening the gates of its dam while the reservoir was at flood stage and still rising and when the mill pond was overflowing the dam. The Supreme Court of Oregon, in discussing the principles of law applicable to such a situation, said: “ The following principles of law may be taken as well established. First, as applicable to this case, that the defendant had the right to erect and maintain its dam at the place where it was constructed and to impound the water therein to the full height of the dam. Second, that it had, in case of a flood or unusual high water, the right to permit flood waters to pass through or over the dam in such quantities as flowed into it. Third, that they had no right, after having impounded the water, to release it in larger quantities than were then flowing into it from above thereby adding to the normal flow of waters so released by their act in raising the flood-gate. Fourth, that if, in addition to the normal flow, defendant, by suddenly releasing large quantities of water in addition to the flood water then coming into its dam, caused damage to the plaintiff either solely by the water so released, or concurrently with the flood water which was going down, it is liable for such damage.” (Emphasis supplied.) (P. 632.)
The opinion, on the rehearing (121 Ore. 636) states: “ That an upper riparian proprietor who has impounded the waters of a stream may release impounded flood waters through his dam without liability to a lower owner, provided he does not swell the natural flow of the stream below the dam to the damage of the *652 lower owner, admits of no dispute: Weiss v. Oregon Iron & Steel Co., 13 Ore. 496 (11 Pac. 255); Teeter v. Nampa & Meridian Irr. Dist., 19 Idaho, 355 (114 Pac. 8).” (Emphasis supplied.) (Pp. 637-638.)
In the Teeter case above, the defendant made some artificial spillways and as a result, water was caused to flow on plaintiff’s property unnaturally so as to augment the dangers and damages. The court said (p. 359): u If the appellant desires to collect these flood waters in its canal and let them out through spillways, it may undoubtedly do so. But it must so distribute them as to cause them to flow down over respondent’s lands in the accustomed channels, and at such places and in such manner as to distribute the waters in Mice manner and volume as they were accustom,ed to flow in their natural course, and thereby entail upon the respondent the minimum of damage, and not increase the dangers and damages over that caused by the flow of the waters in their natural course.” (Emphasis supplied.)
In De Kalb County v. Tennessee Elec. Power Co. (17 Tenn. App. 343), an action was brought to recover damages for the destruction of plaintiff’s bridge, allegedly due to the negligent operation of defendant’s dam at floodtime. The trial court directed a verdict, for the defendant. The action of the trial court was upheld on appeal, the appellate court stating in part: “ This action could only be maintained upon the theory of negligence on the part of the power company in manipulating the gates in the dam, for the company had the right to maintain the dam and to permit flood waters to pass through or over it in such quantities as floioed into it.” (Emphasis supplied.) (P. 352.)
In Bruton v. Carolina Power & Light Co. (217 N. C. 1) the Supreme Court of North Carolina, in affirming a judgment of nonsuit granted at the Trial Term in a flooding case, said in part: “ the owner of a dam may permit water to flow from a dam if the waters coming to the dam are neither accelerated in speed or increased in quantity, so long as ordinary care is exercised in the discharging of the waters ponded behind the dam.” (Emphasis supplied.) (P. 9.)
We reach the conclusion that there is no responsibility or duty on the State to make flood conditions better for lower property owners than they would be if the river flowed naturally in low water and high. In other words, we feel the State was under no duty to ameliorate natural conditions in regard to the flow of the river. In Farnham on Water and Water Rights (Vol. 2, *653 § 487, p. 1631) it is stated: “ The upper owner is not hound to interfere with the natural flow of the water or control it so as to prevent injury to the lower owner.”
The liabilty imposed by section 120 of the Canal Law upon the State for damages resulting from the use or managment of its canals is no greater than that incurred by individuals and corporations engaged in similar enterprises and affords persons injured by such use or management no greater redress than they would have against individuals or corporations for similar injuries. (Hart v. State of New York, 192 Misc. 492.) Section 8 of the Court of Claims Act does not extend that liability. The basis for the holding of the Court of Claims is a finding of fact ‘ ‘ That the Delta Eeservoir is not only a storage reservoir, but it is also a regulating reservoir.” It seems to us that the bare fact that the Delta Eeservoir could be used for regulating purposes does not make it a regulating reservoir. That it did on the occasion of this flood act as a flood control and did lessen flooding below is clearly established.
The State’s witness Hendricks testified that at the peak of the flood 13,650 cubic feet of water per second ran into the reservoir and that if there had been no dam, there would have been a discharge at the gauging station of 13,000 cubic feet in water per second; that 650 cubic feet of water would have been stored in the area above the present site of the dam. The evidence discloses that at the peak of the flood there actually were only 8,800 cubic feet of water per second flowing out at" the gauging point and that the difference of 4,200 cubic feet of water was caused by storage above the crest of the dam spillway.
Claimant’s engineer Vrooman, upon cross-examination, admitted that, in the absence of a dam, the flooding of claimant’s premises would have been greater than it was. Claimant’s engineer Zingerline also admitted that had it not been for the presence of the dam, plaintiff’s premises would have been subjected to greater flooding than occurred.
The Court of Claims found “ Complete records of operations are kept and those in control of the system never permit more water to flow down the Mohawk Eiver below the dam than is coming in above the dam in time of possible flood ”. Such a finding, it seems to us, leads to the irresistible conclusion that all of plaintiff’s damages would have occurred irrespective of the presence of the dam.
Upon the undisputed evidence in this case it. is apparent that not only was the State not negligent in increasing the *654 natural flow of the river at flood time but that on the contrary the maintenance and operation of the dam by the State actually saved claimants from a greater flood.
In the absence of a showing — of which there was none — that the- flooding of claimants’ premises was any greater than it would have been if the dam had never been built, the State cannot be called upon to respond in damages to these claimants.
None of the cases called to our attention by the claimants presents factual situations such as in the instant case. We reach the conclusion that the judgment of the Court of Claims should be reversed and the claim dismissed.