798 P.2d 673 (1990)
103 Or.App. 253
R.D. McKinley and Evelyn McKinley, Husband and Wife; W.J. Bertram and Eris Bertram, Husband and Wife; Paul Skeen and Merlyn Skeen, Husband and Wife; Tom Okai and Helen Okai, Husband and Wife; Fred Saito; Okai Farms, Inc., an Oregon Corporation; and Saito Farms, Inc., an Oregon Corporation, Respondents,
v.
OWYHEE PROJECT NORTH BOARD OF CONTROL; CARL L. HILL, Robert Cruickshank, Alvin Griffin, William H. Kennington, Masa Nishihara, Frank Dines, John Ross and State of Oregon, State Highway Division, and Owyhee Project South Board of Control, Defendants, and
Owyhee Irrigation District, a Political Subdivision of the State of Oregon; Ontario-Nyssa Irrigation District, a Political Subdivision of the State of Oregon; Advancement Irrigation District, a Political Subdivision of the State of Oregon; Bench Irrigation District, a Political Subdivision of the State of Oregon; Slide Irrigation District, a Political Subdivision of the State of Oregon; Payette Oregon Slope Irrigation District, a Political Subdivision of the State of Oregon; Crystal Irrigation District, a Political Subdivision of the State of Oregon; Owyhee Project Joint Committee; Gem Irrigation District, a Political Subdivision of the State of Idaho; and Ridgeview Irrigation District, a Political Subdivision of the State of Oregon, Appellants.
85-09-20, 517-L; CA A47525.
Court of Appeals of Oregon.
Argued and Submitted December 1, 1989.
Decided September 5, 1990.
*674 Tim J. Helfrich, Ontario, argued the cause for appellants Owyhee Irr. Dist., Ontario-Nyssa Irr. Dist., Advancement Irrigation District, Bench Irr. Dist., Payette Oregon Slope Irr. Dist., Crystal Irrigation District, Slide Irr. Dist., and Owyhee Project Joint Committee. With him on the briefs was Yturri, Rose, Burnham, Ebert & Bentz, Ontario.
Allyn L. Sweeney, Ontario, argued the cause for appellants Gem Irr. Dist. and Ridgeview Irr. Dist. With him on the briefs were David E. Day and Quane, Smith, Howard & Hull, Ontario.
Steven J. Pierce, Ontario, argued the cause for respondents. With him on the brief were Jeanne C. Clary and Pierce & Associates, Ontario.
Before BUTTLER, P.J., and WARREN and ROSSMAN, JJ.
BUTTLER, Presiding Judge.
This action arose as a result of damage caused by flooding of the Owyhee River in the spring of 1984. During the preceding winter, the Owyhee Basin received unprecedented snowfall that, coupled with unseasonably warm weather, resulted in an exceptionally heavy spring runoff. The heavy runoff and the physical limitations of the Owyhee Dam combined to force the discharge of substantial amounts of impounded water into the river, flooding plaintiffs' farmlands located downstream. Plaintiffs sought compensation for damages to their real property and associated economic losses, plus damages for emotional distress.
Originally, the defendants included nine irrigation districts (eight of which serve Oregon, and one of which serves Idaho), the Owyhee Project North Board of Control (North Board), the Owyhee Project South Board of Control (South Board), the Owyhee Project Joint Committee (Joint Committee), the individual members of the Joint Committee, John Ross, the manager of the Owyhee Dam, and the Department of Transportation. The trial court dismissed the North and South Boards, the individual defendants and the Department of Transportation,[1] leaving as defendants the irrigation districts and the Joint Committee.
The jury returned a verdict in favor of all plaintiffs against the remaining defendants for property damage resulting from defendants' trespass and negligent operation of the Owyhee Dam and diversion works. The trial court reduced the total amount awarded to $685,853.84 to reflect the percentage of fault attributable to plaintiffs' failure to clean and maintain the Owyhee River channel, which the jury found had contributed to their damages. The trial court then reduced the damages proportionately to aggregate amounts permitted under the Oregon Torts Claims Act. ORS 30.260 to ORS 30.300. Defendants appeal.[2] *675 We reverse in part, affirm in part and remand for entry of a new judgment consistent with this opinion.
The Owyhee Project, constructed by the Federal Bureau of Reclamation (Bureau) in 1926, is comprised of a dam, a reservoir and a system of irrigation canals and pumping facilities. The maximum elevation of the water surface of the dam is 2,670 feet above sea level. The "surcharge area" is the five foot space between the maximum water surface and the top of the dam.[3] From the bottom of the dam to the maximum water surface level, the reservoir holds approximately 1.1 million acre-feet (af) of water. Of that, 715,000 af is "active storage" for irrigation. The dam was designed for irrigation, its primary purpose. However, to the extent that it is not inconsistent with water conservation, the dam is operated for flood control by reserving the top 100,000 af of active storage for flood control.
On August 29, 1951, the Bureau and the nine irrigation districts entered into an Amendatory Repayment Contract (Amended Contract). That contract superseded earlier individual contracts between the districts and the Bureau that obligated the districts to repay the federal government for the construction of the Owyhee Project. Under the Amended Contract, the Bureau retained control of the "reserved works" (the dam, the reservoir and tunnel No. 1) and transferred to the North and South Boards the "transferred works" (all irrigation works other than the "reserved works"), which consist primarily of irrigation canals, laterals and syphons used to deliver water to the irrigation districts and their farmer members. It designated the North and South Boards as the agents of the irrigation districts within their respective regions and granted those boards the authority "to do all things necessary in connection with the management, operation and maintenance of the transferred works."
The Amended Contract also created the Joint Committee to coordinate maintenance and management of the transferred works among the Boards of Control and to facilitate discussion of common operating problems. Although the Joint Committee has no direct responsibility for the care, operation or maintenance of the transferred works, it is contractually obligated to (1) establish the beginning and length of the irrigation season, (2) allocate among the boards of control the gravity water supply, (3) determine the cost of power and energy each year attributable to the operation of the various pumps and (4) determine the kind and extent of extraordinary operation and maintenance work to be undertaken.
In August, 1954, the Bureau and the nine irrigation districts executed a Supplemental Contract, by the terms of which the Bureau transferred control of the operation and maintenance of the reserved works to the Joint Committee, subject to the Bureau's oversight authority. However, the federal government retained title and, if the irrigation districts default on their repayment obligation to the Bureau, control of the reserved works reverts to the Bureau. Even though the dam manager and the Bureau are in constant communication and, despite Bureau recommendations for specific discharges of water,[4] the Joint Committee has exclusive authority to make water release decisions.
Irrigation districts are municipal corporations whose structure and organization are controlled by statute. ORS 545.002 et seq. Each is governed by a board comprised of at least three directors, ORS 545.018, who are elected by water users within the district. ORS 545.014.
*676 In contrast, there is no statutory basis for the North and South Boards or the Joint Committee; they are entities created by contract, whose structure and authority are determined by the Amended Contract, as supplemented. The South Board encompasses the Gem Irrigation District and the Ridgeview Irrigation District and consists of six members, each of whom serves a one-year term. All members are directors of the two districts. Five of the directors (including the President of the district) represent Gem; one represents Ridgeview. The South Board is responsible for operating the segments of the transferred works that are within its boundaries.
Similarly, the North Board's responsibility extends to the irrigation works within its boundaries. It encompasses the remaining seven irrigation districts and consists of six members, who serve one-year terms. All members are directors of irrigation districts within the North Board's territory. Four members represent the Owyhee Irrigation District (three directors and the Secretary of the district). One member must be a director of either the Ontario-Nyssa Irrigation District or the Advancement Irrigation District. The sixth member must be a director of one of the four remaining irrigation districts under the Board's jurisdiction. The North Board employs personnel to operate the canals and deliver water to the irrigation districts. It also provides the manpower to carry out the Joint Committee's contractual obligations to operate and maintain the reserved works.
Six persons constitute the Joint Committee. The North Board elects four members; the South Board elects two. All serve one-year terms, and directorship is a prerequisite to committee membership. Meetings may be called by either the North or the South Board.
Defendants contend that the trial court erred in failing to direct a verdict for them on several grounds, one of which is the alleged agency relationship between the Joint Committee and the irrigation districts with respect to the operation and control of the dam. Because plaintiffs' claims against the districts stand or fall on that theory, we address it first. The trial court instructed the jury that, as a matter of law, the Joint Committee was an agent of the irrigation districts and that any negligence of the Joint Committee would be imputed to the districts.[5] Defendants make three contentions: (1) As a matter of law, the Joint Committee was not the agent of the irrigation districts; (2) as a matter of law, the Joint Committee was the agent of the federal government; or (3) at the very least, agency is a jury question.
A directed verdict is proper when the evidence is such that it permits only one reasonable inference. James v. Carnation Co., 278 Or. 65, 69, 562 P.2d 1192 (1977); see Adams v. Knoth, 102 Or. App. 238, 242, 794 P.2d 796 (1990). To establish an agency relationship, plaintiffs must prove that the irrigation districts had the right to exercise control over the Joint Committee's operation of the reserved works and that the Joint Committee was performing a function on their behalf. See Cain v. Rijken, 300 Or. 706, 713, 717 P.2d 140 (1986).[6] No formal contract is required; an agency relationship may be implied from the circumstances and the apparent relationships and conduct of the parties. Briggs v. Morgan, 262 Or. 17, 23, 496 P.2d 17 (1972); see also Gaha v. Taylor-Johnson Dodge, 53 Or. App. 471, 476-77, 632 P.2d 483 (1981).
*677 Even assuming that the Joint Committee acted for the benefit of the irrigation districts, there is no evidence that the districts had the right to control, or actually controlled, the Joint Committee in operating the dam. Neither the Amended Contract nor the Supplemental Contract expressly created an agency relationship between the irrigation districts and the Joint Committee or granted to the irrigation districts the right to control the Joint Committee's operating decisions. By contrast, the amended contract expressly provides that the North and South Boards are the agents of the irrigation districts within their respective territories.[7]
The irrigation districts have no contractual authority to oversee the Joint Committee's actions; only the federal government, which granted the Joint Committee its authority over the reserved works, has oversight authority. For example, the Joint Committee must obtain permission from the Bureau before it effects any substantial change in the reserved works. Moreover, it must obtain the Bureau's approval to surcharge the reservoir. Finally, if the Joint Committee were to default on its obligations, control of the reserved works would revert to the federal government, not to the irrigation districts.
Neither is there any evidence from which to infer an agency relationship from defendants' conduct or apparent relationships. The record simply indicates that members of the Joint Committee are drawn, indirectly, from the directors of some of the irrigation districts and that the Joint Committee and the two boards share common officers and employees. That alone, however, does not support the inference that the irrigation districts, through their directors, had the right to control, or actually controlled, the Joint Committee's operating decisions concerning the dam. As members of the Joint Committee, they had obligations to the federal government from which the committee acquired its authority to operate the reserved works. Because we find no evidence of either an express or an implied agency relationship, we hold that, as a matter of law, the Joint Committee was not the agent of the irrigation districts.[8] Accordingly, the trial court erred in not directing a verdict for the irrigation districts, whose liability was based solely on respondeat superior.[9]
Before reaching the remaining assignments pertinent to the Joint Committee's liability for its alleged negligence,[10] we review the Joint Committee's flood control actions in the light of the physical and operational constraints of the Owyhee Dam. Although irrigation is the Joint Committee's primary contractual obligation, it also operates the dam for flood control. Those objectives, however, are not necessarily compatible. For example, if the dam were operated solely for irrigation, the Joint Committee would discharge little, if any, runoff in order to have a full reservoir for as long into spring as possible. Conversely, if flood control were the primary objective, the Joint Committee might drain the reservoir to the greatest extent possible to accommodate spring runoff.
Because the dam was designed for irrigation and not flood control, its physical structure limits the amount of water that the Joint Committee may release at any given time. There are three methods to release excess runoff. The principal release mechanism is an overflow spillway, which the parties refer to as the "ring gate." The gate is set at an elevation of 2,658 feet, 12 feet lower than the maximum water surface, and can be raised or lowered within that 12 foot range. It has the capacity to release up to 145,000 af of water *678 at a rate of 30,000 cubic feet per second (cfs). If the water falls below the 2,658 foot elevation, the gate ceases to operate as a drain into the Owyhee River.
The second method involves discharging water through three needle valves, which were constructed primarily for irrigation purposes but, according to standard operating procedures,[11] may be used for flood control. Although the combined discharge capacity of the needle valves is 3,300 cfs (3,170 af daily), they have limited capacity, both in terms of the amount that they can discharge and the length of time that they can be used. According to defendants' expert witness, they are not designed for large releases at a continuous flow. He testified that a sustained release by one valve of 900 cfs over a period of three months would require a complete overhaul before it could be used in the next irrigation season.
The third method involves using tunnel No. 1 to divert water to a series of irrigation canals, rather than discharging it into the Owyhee River. The tunnel is located at an elevation of 2,590 feet, below the lowest setting of the gate. It controls the release of water in active storage and has the capacity to discharge 1,700 cfs. The tunnel was designed to deliver irrigation water to the canals, and standard operating procedures are silent with respect to its use for flood control purposes.
Difficulty in forecasting also hampers flood control efforts. Runoff in the Owyhee Basin is notoriously difficult to forecast. The Joint Committee uses forecasts published by the Bureau and the Soil Conservation Service (SCS), beginning in January of each year, which are updated monthly to account for actual runoff. However, the forecasts can vary widely, as was the case in January, 1984. The Bureau predicted 1.8 million af; the SCS forecasted 1.2 million af. Actual runoff for 1984 was 2.6 million af, compared to an historical average of 770,000 af. An additional limitation is that neither the Bureau nor the SCS attempts to predict the timing of the runoff, critical information to the Joint Committee in the decision-making process.
The Joint Committee initiated flood control measures as early as December 20, 1983, when it received a report that the snow pack in the Owyhee watershed exceeded 400 percent of normal.[12] In response, the committee set the gate at the lowest possible elevation to reserve the top 100,000 af for the spring runoff, in effect, discharging an amount equal to the inflow. It continued that policy through January and February, 1984, which resulted in releases less than those recommended by application of the rule curve.[13] At no time did the Joint Committee attempt to create more than 100,000 af storage to capture the spring runoff.
By March 27, 1984, the water level in the dam had crept up, leaving only 30,000 af vacant storage, while the forecasts predicted a remaining runoff of approximately one million af. Aware of the flooding potential if more than 10,000 cfs were discharged,[14] the committee decided that a large discharge over a short period of time was preferable to somewhat smaller discharges sustained over a longer period. Therefore, in response to the increased elevation of the surface water, the Joint Committee increased the discharge to a flat rate of 10,000 cfs. It realized that some flooding would result if that rate were continued for an extended period; however, it *679 considered a steady outflow less damaging than peak discharges. Nevertheless, at the peak flood stage, it was forced to discharge more than 20,000 cfs, and discharges exceeded inflow during eight days in the latter part of April.
Plaintiffs' expert testified that, given the forecasted runoff, the Joint Committee should have drawn down the reservoir to create more storage earlier in the season. It could have accomplished that by (1) releasing the maximum amount of water through the gate, beginning in January, 1984, (2) using the needle valves and (3) using tunnel No. 1 to divert some of the flood water to the irrigation canals. Had it done so, discharges would not have exceeded 11,000 cfs. In turn, defendants' expert offered reasons why those were not viable alternatives.
Relying on Crawford v. Cobbs & Mitchell Co., 121 Or. 628, 253 P. 3, 257 P. 16 (1927), defendants contend that the Joint Committee had the right, without liability, to release flood waters in the same quantities as flowed into the reservoir and that the trial court erred in denying their motion for a directed verdict, in not instructing the jury in accordance with Crawford and in giving the instruction that it gave. The defendant in Crawford operated a large sawmill and had constructed a dam near the headwaters of the Siletz River. When the river was at flood stage and the defendant's pond was overflowing, it released some of the impounded water. Although the court affirmed a verdict in favor of the plaintiff, whose land had been flooded, it articulated the fundamental principle that an
"upper riparian proprietor who has impounded the waters of a stream may release impounded flood waters through his dam without liability to a lower owner, provided he does not swell the natural flow of the stream below the dam to the damage of the lower owner * * *." 121 Or. at 637, 257 P. at 17.
Assuming that the holding in Crawford extends to a dam operator, in addition to an impounder, it does not appear to apply to a situation where, as here, the dam operator is obligated contractually to the owner, for the benefit of downstream land owners, to undertake flood control measures. Although irrigation is the sole authorized function of the Owyhee Project, the Supplemental Contract requires the Joint Committee to
"[c]ooperate with the Secretary [of the Interior] to the end of coordinating, to the extent practicable not inconsistent with the primary use of the reservoir as a source of water supply for the project lands, Columbia River Basin water management operations to effect flood control or other coordinated river basin water management uses."
Whatever right the Joint Committee had to release impounded flood waters, it was tempered by the committee's contractual obligation to operate the dam for flood control. Accordingly, we find no error in the trial court's instruction that a
"dam operator may not be held liable for damages caused by flood waters, if the flood waters permitted to flow downstream from the dam are no greater than the quantity of water flowing into the reservoir, provided that you find that the operator has acted with reasonable care to prevent or lessen the flood * * *."
Because Crawford is inapposite, the trial court did not err in failing to give defendant's requested instructions that relied on Crawford.
At the close of plaintiffs' case-in-chief and again at the close of all the evidence, defendants moved for a directed verdict generally against all plaintiffs, contending that plaintiffs had failed to prove that the Joint Committee's negligence caused all or any determinable portion of plaintiffs' damages.[15] In their last assignment of error, defendants contend that the trial court erred in denying their motions, because plaintiffs had conceded that they *680 would have suffered some damage, regardless of the Joint Committee's alleged negligence, and because plaintiffs had not attempted to segregate their damages. Plaintiffs' position is, and consistently has been, that little, if any, permanent damage would have been sustained in the absence of the Joint Committee's negligent operation of the dam. The jury awarded plaintiffs all of the damages pled in their fourth amended complaint relating to property damage and associated economic loss. We review for any evidence that would permit the jury to find for plaintiffs. See Moini v. Hewes, 93 Or. App. 598, 600, 763 P.2d 414 (1988), rev. den. 307 Or. 245, 767 P.2d 75 (1988).
To recover, plaintiffs' evidence must show the damages sustained with reasonable certainty, both as to their nature and their cause. Parker v. Harris Pine Mills, 206 Or. 187, 205, 291 P.2d 709 (1955). Plaintiffs' expert testified that, if the Joint Committee had followed the rule curve to the fullest extent possible, discharges would not have exceeded 11,000 cfs over a fifteen day period. As it happened, the Joint Committee discharged 10,000 cfs or above during the entire month of April, peaking at 18,000 to 20,000 cfs for a number of days during the third week. Although plaintiffs' counsel conceded during his opening statement that plaintiffs experienced some flooding at flows below 11,000 cfs, the general import of plaintiffs' testimony is that their significant losses resulted from flows in excess of that amount.
For example, although plaintiff Bertram testified that most of his acreage was submerged on April 1, 1984, at flows of 10,000 cfs, the water was standing still, so it "hadn't hurt it too bad." It was not until April 18, 1984, when flows reached 18,000 cfs, that the flood waters washed away top soil and destroyed the land. At that rate, the flood waters washed out a concrete ditch and cut a channel through the middle of his property. Bertram presented evidence of the costs incurred to restore his land and irrigation structures, the diminution in property value attributable to the flood and the loss of rental income. Similarly, plaintiff McKinley testified that, at 18,000 cfs, the water destroyed buildings, either by washing away barns or undermining the foundations of his granaries. It destroyed his land by cutting a channel 60 feet wide and six to eight feet deep. McKinley presented evidence similar to Bertram's regarding the dollar amount of his losses. Plaintiff Skeen testified that, although flood waters covered 25-30 acres at flows of 10,000 cfs, it did not start "cutting" until 12,000 to 13,000 cfs. In addition to his property damage, he presented evidence relating to lost profits from his crop loss.
Clearly, that evidence is sufficient to support an award of damages for flows over 11,000 cfs. What is less clear from the record is the type and extent of damage suffered at or below 11,000 cfs. Although most plaintiffs conceded that some damage did occur at the lower releases, none attempted to quantify the incremental effect, even though their expert testified that he could have done so. Moreover, the type of damage differed with each plaintiff. Most plaintiffs acknowledged that some of their land was under water at flows under 11,000 cfs. Only plaintiff Saito testified that one of his dikes broke at 8,000 to 10,000 cfs and that the water was "doing damage right along."
Plaintiffs did, however, testify with respect to each component of their damages. Each plaintiff sought compensation for damages relating to diminution of land value, loss of top soil, land erosion, cost of land restoration, costs associated with fall planting and loss of profits or rental revenues. For example, plaintiff McKinley sought $212,776.06 in damages. He offered evidence on each component of his loss: diminution of land value, $72,000 ($1,000 per acre); loss of rental income for 1984 and 1985 of approximately, $15,000; land restoration, $91,460; loss of buildings, $10,000, and equipment, $24,316. Plaintiff Skeen segregated his losses between property damage and lost profits for his anticipated crops.
Defendants could have moved for a directed verdict against particular plaintiffs *681 on the basis of sufficiency of evidence, because at least plaintiff Saito, by his own admission, suffered significant damage at flows below 11,000 cfs. However, defendants moved for a directed verdict against all plaintiffs, contending that their evidence failed to establish that any negligence attributable to defendants caused any or all of their damages. Defendants made no effort to separate the claims of the various plaintiffs, although they were alleged separately, and the trial court was not obligated to do so. Plaintiffs presented evidence that substantial damages resulted from flows exceeding 11,000 cfs. There is also some evidence from which the jury could have inferred that, although the lesser flows inundated some of plaintiffs' land, not all of them suffered damage at or below 11,000 cfs. For example, plaintiff McKinley attributed all of his damages to flows at or above 18,000 cfs. He testified that the flood waters did not break through to his property until the third or fourth day of sustained releases at 18,000 cfs. Moreover, there is evidence that the flood waters covered portions of plaintiffs' lands from April 1, 1984, until sometime in May. The jury could have inferred that substantial crop loss resulted from the length of time that the land remained under water.
There was some evidence that the Joint Committee was negligent in the operation of the dam and that its negligence was the legal cause of at least one or more of plaintiffs' damages. If any plaintiff was entitled to have the case submitted to the jury, the trial court did not err. Because we conclude that at least one plaintiff was so entitled, the trial court did not err in denying defendants' motions for a directed verdict.
Plaintiffs, in their cross-assignment of error, contend that the trial court erred in refusing to impose strict liability on the Joint Committee.[16] We do not reach the merits, however, because that contention is properly the subject of a cross-appeal, not a cross-assignment of error. It is true that a respondent who seeks to sustain a judgment is not required to cross-appeal to preserve on appeal the alleged error by the trial court. Artman v. Ray, 263 Or. 529, 501 P.2d 63, 502 P.2d 1376 (1972); Badger v. Paulson Investment Co., 98 Or. App. 200, 779 P.2d 1046, modified 100 Or. App. 12, 784 P.2d 125 (1989), rev allowed 309 Or. 521, 789 P.2d 1386 (1990). Here, the jury found that plaintiffs' negligence in failing to keep the downstream channel clear of debris contributed to their injury, and the trial court reduced their damages accordingly. If we were to hold the Joint Committee strictly liable, plaintiffs could recover all of their damages. Thus, plaintiffs seek to alter the judgment, not to sustain it. Accordingly, we do not reach the merits of plaintiffs' cross-assignment.
Judgment reversed in part and remanded with instructions to vacate the judgment against all irrigation district defendants and to enter a new judgment against defendant Owyhee Project Joint Committee consistent with this opinion; otherwise affirmed.

*682 APPENDIX

NOTES
[1] The correctness of that ruling is not before us. However, we note that it is no longer necessary to join the individual members of an unincorporated association to maintain an action against the association or to create an enforceable judgment against it. See ORCP 26 B; ORCP 67 E(1); Merrill, Oregon Rules of Civil Procedure: 1990 Handbook, 203. No issue is raised by any party on that question.
[2] Two groups of defendants appeal. Because one adopts the arguments of the other, we do not distinguish between their assignments of error.
[3] See Appendix.
[4] Beginning in January and continuing through June of each year, the Bureau calculates a desired discharge, using a "rule curve" in conjunction with current water storage data and forecasted runoff. The rule curve is a theoretical model that operates to save a minimum of 70,000 af of vacant storage space, with the objective of limiting discharges into the river to 8,000 cubic feet per second (cfs). The Joint Committee is not obligated to follow the rule curve; it is advisory only.
[5] The trial court concluded:

"I'll grant you that the organizational makeup of the Owyhee River Project is either a legal nightmare, or an ingenious creation devised to prevent anyone from being legally responsible for anything."
[6] Plaintiffs argue that Samuel v. Frohnmayer, 82 Or. App. 375, 728 P.2d 97 (1986), modified 84 Or. App. 80, 728 P.2d 97, rev. den. 303 Or. 261, 735 P.2d 1224 (1987), created a broader test for agency. There we stated that "control is not necessary to establish an agency relationship in the context of the [Oregon Tort Claims Act], at least with respect to those who volunteer their services to the state at its request." 82 Or. App. at 380, 728 P.2d 97. We noted, however, in Moxness v. City of Newport, 89 Or. App. 265, 748 P.2d 1014, rev. den. 306 Or. 79, 757 P.2d 853 (1988), that Samuel was decided on both elements of the common law test. 89 Or. App. at 268, 748 P.2d 1014.
[7] However, that agency extends only to the transferred works. The boards, as such, have no authority over the operation and maintenance of the reserved works.
[8] Given our disposition of the case, it is unnecessary to decide whether the Joint Committee is the agent of the federal government.
[9] We find no merit in plaintiffs' reliance on the theory of agency by estoppel.
[10] Because the Joint Committee is not a "public body," ORS 30.260(4), nor the agent of a public body, we do not address defendants' assignments of error relating to the Oregon Tort Claims Act.
[11] The Bureau publishes a manual containing standard operating procedures applicable to the Owyhee Dam. Those procedures are advisory, not mandatory.
[12] The actual amount of runoff is determined by several factors, including the moisture content of the snow and of the soil, the location of the snowpack and the weather conditions.
[13] For example, under the rule curve recommendations, daily discharges for the month of January should have been 6,264 cfs. However, under the policy of discharging an amount equal to inflow, because inflows were significantly less than had been forecast, the actual daily discharge averaged 3,810 cfs.
[14] Ross testified that a discharge rate of 3,500 to 6,000 cfs will flood the lowlands. At a rate of 10,000 cfs, flood waters will reach fields and cover roads and, between 10,000 and 12,000 cfs, flood waters are likely to reach homes.
[15] In a motion for judgment notwithstanding the verdict, defendants renewed that contention after the verdict was rendered.
[16] Although the complaint alleged theories of recovery premised on negligence, trespass and strict liability, the trial court submitted the case to the jury on negligence and trespass only. Plaintiffs cross-appealed, assigning error to that ruling. We dismissed plaintiffs' cross-appeal as untimely.