Argued January 7, affirmed February 4, 1953

# BARRY v. OREGON TRUNK RAILWAY

253 P. 2d 260

248

*Elton Watkins,* of Portland, argued the cause and filed a brief for appellant.

*Cleveland C. Cory,* of Portland, argued the cause for respondent. With him on the brief were Hart, Spencer, McCulloch, Rockwood & Davies and Manley B. Strayer of Portland.

Before LATOURETTE, Chief Justice, and WARNER, BRAND, TOOZE and PERRY, Justices.

TOOZE, J.

This is an action to recover damages for personal injuries alleged to have been caused by an assault and battery, brought by Patrick J. Barry, as plaintiff, against Oregon Trunk Railway, a corporation, as defendant. The action was tried to a jury, resulting in a verdict and judgment for defendant; plaintiff appeals.

Defendant is an Oregon corporation engaged in the railroad business. It operates a railroad line from Wishram, Washington, in a general southerly direction, to Bend, Oregon, a distance of approximately 151 miles. At a point 85 miles south of Wishram, defendant maintains a station known as South Junction. At South Junction there are a depot, bunkhouse, section house, water tank, and a passing track, or siding.

At the time of the events hereafter mentioned, plaintiff was engaged in operating as a tenant of the owner a ranch which lay largely west of and adjoining the railroad right of way at South Junction. A line fence which was in a state of disrepair marked the westerly boundary of defendant's right of way and the

easterly boundary of the ranch. Pursuant to arrangements made between plaintiff and defendant, defendant furnished posts and wire, and plaintiff undertook to perform the work, necessary to the reconstruction of the line fence. The Deschutes river formed the westerly boundary line of the ranch. On the easterly side of the ranch there was a ditch designed for use in irrigation, a part of which was located on the railroad right of way, west of the railroad tracks and near the bunkhouse.

In reconstructing the fence and to render the ditch suitable for irrigation purposes, it was first necessary to clean out the fence row and the ditch, removing therefrom an accumulation of weeds and other debris.

One Thomas J. Faherty, Sr., was employed by defendant at South Junction as a night trackwalker. His duty was to patrol the railroad right of way between milepost 85 and milepost 86 during the nighttime for the purpose of protecting trains from falling rocks or other hazardous conditions. This included keeping trespassers, livestock, automobiles, or anything else that might be a hazard to a moving train, off the railroad tracks. Rule 1555, adopted by defendant and applicable to Faherty, as well as to other employes of defendant, provides:

"1555. Fires on or near the right of way must be extinguished or protected against. Property of others, as well as that of the company, exposed to such fires must be protected."

Plaintiff testified that on or about April 9, 1949, he made arrangements with Faherty to burn the weeds and brush along the fence row and in the ditch. He stated that Faherty agreed to assist in the work. Plaintiff spent the morning of April 11, 1949, in Madras, returning to his ranch shortly after noon. The house in

which he lived was located several hundred feet from the railroad. He loaded burning equipment into his motor truck and drove to the railroad right of way. About 1:30 p. m. he commenced burning weeds near a garden maintained by Faherty. During this time he and Faherty visited, talking and laughing. Later plaintiff began burning weeds, brush, and tree limbs in the irrigation ditch. At its closest point, this fire was about 30 feet from the bunkhouse.

Shortly after plaintiff started the fire in the ditch, Faherty and his two sons came up the track and stopped near that fire. According to plaintiff, all of them were laughing, joking, and watching the fire, which was then under control. Plaintiff's version of what happened at that time and place may best be stated by quoting from his testimony. Upon direct examination, he testified:

"Q When he came up there, was the fire yet in the trees limbs?

"A It was burning to the tree limbs then. It was coming down the ditch and burning to the tree limbs.

"Q Was there any wind?

"A There was just a little breeze.

"Q Go ahead and tell us what happened then.

"A Well, he—Tom, Jr. was standing down talking to me. I was down below, and he was there. And he hollered over to Tom, Jr. and says, 'Get some dirt on the fire.' He says, 'It is getting too big.' I says, 'That fire ain't too big, Tom. It isn't going to hurt anything.' He says, 'More dirt. More dirt.' I kind of laughed, and I said, 'Tom, don't put the fire out.' I says, 'I want to burn up this trash and get it out of the ditch.' So he quieted down a little bit. And I walked up on top of the railroad track, and I stood up there with him at least three or four minutes, and we were talking, and finally he says, 'You have got no right to build a fire here. I am

responsible.' I say, 'Tom, you are getting overtime for helping me burn this. What are you nagging about?' He says, 'I am not nagging.' He says, 'Don't you ever put another fire on this ranch.' I says, 'Why, I will put a fire on the ranch any time I darned please.' And I walked over and sat down on the tie.

"Q  Where was the tie located?

"A  Right along the edge of the bank. He says, 'You can't. You can't.' I says, 'Oh, quiet down.' And from there everything kind of went numb. I couldn't move. And then I got it across the shoulders.

"Q  When you say 'everything went numb', what do you mean?

"A  I was stunned, and I just couldn't move, until I got hit over the shoulder. And when I got hit over the shoulder, I just dove down the bank.

"Q  When you say you went numb, you mean he hit you?

"A  Yes, sir.

"Q  What did he hit you with?

"A  The shovel. He got me right on the head there, fourteen stitches, and got me right on the shoulder and the neck."

On cross-examination plaintiff testified in more detail as follows:

"A  I was in the corner, kind of sitting on an old fence post watching it.

"Q  Down next to the bunk house?

"A  Yes, watching it when Tom and his two boys came.

"Q  So you were right there by the fire all the time?

"A  Yes, I was right there all the time.

"Q  And did you have any conversation with them when they first came on the scene?

"A  Yes, we were talking and laughing. Tom was standing there just with a shovel, just general conversation.

"Q How long did you talk before this trouble started?

"A Oh, I think we must have been there at least 20 minutes.

"Q Fifteen or twenty minutes?

"A Yes, something like that. I don't remember just how long it was.

"Q Did each of the boys also have a shovel?

"A Yes. Tommy, the large boy, he came down and was by me. And the youngest boy and his dad was up on the track.

"Q That is James was up on the track?

"A Yes.

"* * * * *

"Q Did you ever see Jim with a shovel?

"A Yes, his father sent him down to Harry Hawkins to get a shovel. And he got Harry Hawkins' shovel.

"Q When was it he sent him down?

"A I don't remember.

"Q It was after they came around the bunk house?

"A Yes.

"Q It was after they started to put the fire out?

"A Yes. Tom hollered down to his boy and said, 'Get some dirt on the fire.' And I said, 'Wait a minute, Tom' —

"Q (Interrupting) Was that the time he sent Jim over to get Mr. Hawkins' shovel?

"A Yes.

"Q At the same time he told Tom to shovel some dirt on?

"A Yes.

"Q That is when the argument started as to whether they should throw dirt on the fire or whether they should not?

"A Yes. And old Tom, he ran down the bank and shoveled dirt just like a wildman for awhile, and then started back up the bank and hollered

down at his son again and hollered, 'Get more dirt. Get more dirt.' And I came right between the fence—

"* * * * *

"Q   You considered there was no reason to throw any dirt on it at all?

"A   Shouldn't have been. Shouldn't have been no dirt put on it.

"Q   That is the reason why you objected to Mr. Faherty putting dirt on it?

"A   Yes, sir.

"Q   Then, as I understand it, when you did make your objection to putting dirt on the fire, that is when Thomas Faherty said you had no business setting a fire on the track?

"A   Not right away he didn't. It was later on. It was after I had went up and sat down on the tie along the edge of the railroad track.

"Q   After you went up and sat on a tie?

"A   Yes. Went up there, and I was sitting down, and Tom was standing up to the side of me. And pretty soon he started to hollering for more dirt. And I said, 'Tom, don't put more dirt on that fire.' I says, 'I want that to burn'—

"* * * * *

"Q   You were sitting with your back to him while you were carrying on this conversation?

"A   Yes.

"Q   Were you talking over your shoulder?

"A   Over my shoulder, because I had been talking to his son.

"Q   You were sitting down with your back to him when you said, 'Don't throw dirt on the fire'?

"A   (Witness nods head affirmatively.)

"Q   And Tom said it was getting too big?

"A   No, he didn't.

"Q   He didn't? What did he say?

"A   He started hollering to his boy for more dirt. He says, 'You haven't got any business building a fire.' I says, 'I had permission to build it.'

"Q You said what?

"A I says, 'I had permission to build a fire.'

"Q You said, 'I have permission to build a fire'?

"A Yes, I told Tom that.

"Q Didn't you also say you would build a fire on the fence any time you pleased?

"A He told me, 'You have got no business building a fire on this ranch.' And I says, 'I will build a fire any time I darned please.' And he jumped up and says, 'You can't. You can't.' And then he hit me over the head with the shovel.

"Q During all this time you were sitting down with your back to him?

"A Yes, I was sitting down to rest a few minutes."

Thomas J. Faherty, Jr., and James Faherty, sons of Thomas J. Faherty, Sr., give an entirely different version of the altercation. According to their testimony, plaintiff was the aggressor, and their father struck the blow in defense of his person from an unjustifiable assault by plaintiff. Thomas J. Faherty, Sr., died July 18, 1949.

Plaintiff alleges 13 assignments of error. The first eight refer to his objections to the admission of certain testimony, which objections were overruled and the evidence admitted. His ninth assignment relates to the refusal of the trial court to give to the jury one of his requested instructions. The remaining assignments of error are directed to his exceptions taken to certain instructions that the court did give to the jury.

The record discloses that when both parties had rested and before argument of counsel, defendant moved the court for a directed verdict in its favor on the ground "that the plaintiff has failed to establish that the assault and battery relied upon in the com-

plaint was committed by Thomas Faherty acting within the scope of his employment as an employee of the defendant.'' The motion was denied.

Manifestly, if this court should determine, as a matter of law, that the evidence is insufficient to submit the question of defendant's liability to the jury as a question of fact, and that defendant's motion for a directed verdict should have been sustained, it would then be unnecessary to consider plaintiff's several assignments of error. *Wells v. Nibler,* 189 Or 593, 221 P2d 582.

■ We shall, therefore, first direct our attention to that phase of the case. In doing so, we are required to view the evidence in a light most favorable to plaintiff.

The only eyewitnesses to the altercation were the participants therein and the two sons of Thomas J. Faherty, Sr., now deceased. Hence, the only testimony to sustain plaintiff's version of the affair is his own, as hereinabove quoted. For the purposes of the discussion to follow we must, and do, accept his testimony as being true.

The question for decision is whether the wrongful act of Faherty was committed within the real or implied scope of his authority as an employe of defendant. If it was, the defendant is liable; otherwise, no liability attaches.

■ Ordinarily, it is a question of fact for the jury to determine whether a wrongful act committed by a servant is within the real or implied scope of his authority. Where, however, the facts attending the injurious occurrence are not disputed and the evidence is susceptible of but one conclusion, the question is one of law for determination by the court. 35 Am Jur, Master and Servant, 1040, § 600.

In *Dalrymple v. Covey Motor Car Co.*, 66 Or 533, 541, 135 P 91, this court said:

> "* * * Where the relation of master and servant is established, the question of whether in the particular instance the servant was acting within the scope of his employment, if there is no conflict in the facts, is a question of law for the court."

Also see *Crawford v. Cobbs & Mitchell Co.*, 121 Or 628, 643, 253 P 3, 257 P 16

◼ In every case the primary test to determine the master's liability for the act of his servant under the doctrine of respondeat superior is whether the act was within the scope of his employment. No general rule has been, nor can be, formulated which will determine in each case whether the servant was acting within the scope of his employment. Each case must be decided upon its own particular facts and circumstances. However, it may be stated as a general rule that whatever is done by the employe in virtue of his employment and in furtherance of its ends is deemed by the law to be an act done within the scope of his employment, and that, in determining whether the servant's conduct was within the scope of his employment, it is proper to inquire whether he was at the time engaged in serving his master. It is not essential that the conduct be specially authorized by the master. It is enough that it is impliedly directed or authorized by the master, or is of the same general nature as that authorized, or is incidental to the conduct authorized. 57 CJS, Master and Servant, 303, § 570.

◼ A servant has implied authority to do what is usual, customary, and necessary to perform the duty entrusted to him by the master, and accordingly an act is within the scope of a servant's employment where

it is reasonably necessary or appropriate to accomplish the purpose of his employment and intended for that purpose, although in excess of the powers actually conferred on the servant by the master.

Where the nature of the employment or the duty imposed on a servant is such that the master must contemplate the use of force by the servant in performance as a natural or legitimate sequence, the master will be held liable for the willful or malicious act of his servant even though he had no knowledge that the act was to be done, and although the act was in disobedience of express orders or instructions given by him. On the other hand, the master is not liable for the willful and malicious acts of the servant committed outside the scope of his employment, and this is true even though the acts in question are committed in the course of the employment or the employment furnishes the opportunity for the wrongdoing. 57 CJS, Master and Servant, 321, § 572.

If the wrongful act of the servant is committed to effect some independent purpose of his own, the servant alone is ordinarily liable therefor. In 57 CJS, Master and Servant, 323, § 574, it is stated:

"As a general rule the act of a servant done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment so as to render the master liable therefor. In these circumstances, the servant alone may be held liable for the injury inflicted. If the servant steps aside from the master's business for some purpose wholly disconnected from his employment, the relation of master and servant is temporarily suspended, and the master is not liable for his acts during such time. This is true no matter how short

the time and even though the servant does not literally and physically step aside from the locus in quo."

In *Goodwin v. Rowe,* 67 Or 1, 7, 135 P 171, we said:

"The doctrine is proverbial that the master is not liable for every wrong which the servant commits while in the performance of his contract of employment; the responsibility of the master attaching in those instances when a servant is acting within the real or apparent scope of his employment and in line with his duties. As an inevitable deduction from these two propositions is the other, that, when a servant walks beyond the limits of his employment, for ever so short a distance, to perform an act disassociated with his master's business, the latter incurs no responsibility: [Citing cases.]."

In *Dalrymple v. Covey Motor Car Co.,* supra, at page 541, this court stated:

"In determining whether the act of Harrington was committed within the scope of his employment by the Covey Motor Car Company, the decisive question is not whether he was acting in accordance with the instructions of his master nor who owned the automobile at the time. While these are helpful in determining the question, the real test is: Was he at the time doing any act in furtherance of the company's business? Where a servant having completed his duties to his master then proceeds to prosecute some private purpose of his own, the master is not liable. If the servant while engaged about his master's business merely deviates from the direct line of duty to accomplish some personal end, the master's responsibility may be suspended. But while the servant is pursuing his line of duty within the scope of his employment, even if in violation of express orders, a deviation therefrom is not an abandonment of the master's service: *Mulvehill v. Bates,* 31 Minn. 364, 366 (17 N.W. 959, 47 Am Rep. 796); *Weber v. Lockman,* 66 Neb. 469 (92 N. W.

591, 60 L.R.A. 313); *Ritchie v. Waller,* 63 Conn. 155 (28 Atl. 29, 38 Am St. Rep. 361, 27 L.R.A. 161)."

In *Tyler v. Moore* et al., 111 Or 499, 509, 226 P 443, the following rule is stated:

"* * * We take it that the true test of whether a master is liable for the act of his servant is whether the servant at the time of the commission of the injury *was performing a service* for the master *in furtherance of the master's business,* not whether it was done in exact observance of detail prescribed by his employer." (Italics ours.)

Also see *Akerson v. D. C. Bates & Sons, Inc.,* 180 Or 224, 228, 174 P2d 953; *Oneta v. Paul Tocci Co., Inc.,* 67 NYS2d 795, 797, 271 App Div 681; 3 Cooley, Torts, 58 § 393.

In support of his contention that a jury question was presented upon the matter of defendant's liability for the acts of Faherty, plaintiff cites and quotes from a number of authorities. We are of the opinion that they do not apply to the facts in the instant case.

The case of *Linkhart v. Savely,* 190 Or 484, 227 P2d 187, involved an action for damages for assault and battery, but no question of liability of a master for the tortious acts of his servant was in issue.

What we have said about the decision in *Linkhart v. Savely,* supra, is true respecting the case of *Silfast v. Matheny,* 171 Or 1, 136 P2d 260, also cited by plaintiff.

Plaintiff invites attention to *Durkee v. Carr,* 38 Or 189, 63 P 117. In that case the question was presented whether the agent acted within the scope of his authority. The court, at page 193, said:

"* * * The rule is elementary and universal that every grant of power by a principal to his agent,

where no limitations are apparent, is to be construed as carrying with it, as an incident thereto, the authority to do all things *proper, usual, necessary, and reasonable* to carry into effect the objects and purposes sought to be accomplished by the authority conferred: * * *. But stipulations in a lease executed by an agent whose authority therefor is not reasonably implied in the power delegated are not binding upon his principal." (Italics ours.)

The case of *Frangos v. Edmunds,* 179 Or 577, 173 P2d 596, is cited by plaintiff. There is nothing whatever in that case which tends to throw any light upon the problem before this court.

In addition to the foregoing, plaintiff cites the following cases: *Haehl v. Wabash R. Co.,* 119 Mo 325, 24 SW 737; *Pierce v. N. C. Ry. Co.,* 124 NC 83, 32 SE 399, 44 LRA 316; *Texas & P. Ry. Co. v. Hayden,* 6 Tex Civ App 745, 26 SW 331; *Craker v. The Chicago & Northwestern Railway Company,* 36 Wis 657, 17 Am Rep 504.

In the Craker case, supra, the Wisconsin court held that a railroad company is bound to protect female passengers on its trains from all indecent approach or assault; and that where a conductor of the company's train makes such an assault on a female passenger, the company is liable for compensatory damages. In the Pierce case the North Carolina court held the railroad company was liable for injury done by the wanton, willful, and malicious act of an employe within the scope and in the discharge of his duties. The case involved the tortious act of a brakeman in throwing coal at a boy on the tender of an engine, by which he knocked him off, or frightened him so that he jumped off, causing the boy to be run over and killed by the engine. A somewhat similar case with a like holding is

that of *Newkirk v. Oregon-Wash. R. R. & Nav. Co.*, 128 Or 28, 273 P 707, 72 ALR 530. This Oregon case was not cited by plaintiff. In the Haehl case the question for decision by the Missouri court was whether the railroad company was liable for the tortious act of its bridge watchman, whose duty it was to guard the railroad bridge against trespassers. The watchman had killed the decedent after he had ordered him to get off the bridge and deceased had started back pursuant to such directions. The question of liability of the company for this act was held to be a jury question. In the Hayden case the Texas court considered a question almost identical to that presented in the Pierce and Newkirk cases, supra, and arrived at the same conclusion.

The facts of the instant case are decidedly different from those in the cases last above discussed. In those cases the use of force in proper instances was contemplated and was a part of the duty of the servant. As we before observed, where the use of force at times is a part of the duty of the servant, the master is not excused from liability when the servant uses excessive, or even unjustifiable, force in the performance of his duty, and even though in so doing the servant disobeys positive instructions of the master. These rules are particularly applicable to the acts of employes in charge of the operation of trains. In Restatement, Agency, 547, § 245, the rule is thus stated:

"A master who authorizes a servant to perform acts which involve the use of force against persons or things, or which are of such a nature that they are not uncommonly accompanied by the use of force, is subject to liability for a trespass to such persons or things caused by the servant's unprivileged use of force, exerted for the purpose of accomplishing a result within the scope of employment."

The performance of the duties assigned to Faherty was not commonly accompanied by the use of force. He was a night trackwalker. His principal duty was to patrol the railroad track at night and protect moving trains from rocks and other obstructions to railroad traffic. To perform this duty, it would hardly be contemplated that the use of force against persons would be necessary in any circumstances. His duty was very different from that of the watchman employed to guard the railroad bridge against trespassers. True, Faherty was under duty, the same as all other railroad company employes, to protect the property of his master from fire hazards. This duty was in no way peculiar to Faherty's employment, but even in the performance of this duty the need of the use of force against the person of another could not reasonably be anticipated or foreseen.

In 35 Am Jur, Master and Servant, 992, § 558, it is said:

"Ultimately, the question to be determined is whether the wrongdoer was engaged in performing a service which was a contemplated or foreseeable incident of his employment. If it is to be concluded that the defendant employer ought to have foreseen or anticipated that the employee would act in the manner in which he is shown to have acted, a recovery is sustainable. If, on the other hand, it is to be concluded that the defendant could not have foreseen and prevented the injurious occurrence, the plaintiff is not entitled to recover."

At the time Faherty and his sons approached the fire then burning near the bunkhouse, plaintiff was sitting on an old fence post across the ditch from the railroad track, and watching the fire. The parties talked for 15 or 20 minutes, Faherty remaining on the track. It was a general conversation. They were "talk-

ing and laughing." Thomas J. Faherty, Jr., had gone down the railroad grade and was standing near plaintiff, talking to him. At the expiration of 15 or 20 minutes, Faherty called to his son Thomas, Jr., and said: "Get some dirt on the fire. It is getting too big." Plaintiff remonstrated, saying to Faherty: "That fire ain't too big, Tom. It ain't going to hurt anything." But Faherty told his son to throw on more dirt, and he personally assisted in that chore. He told his other son to get another shovel, so that he could help in quenching the fire. When Faherty ordered his son the second time to throw on more dirt, plaintiff "kind of laughed" and said, "Tom, don't put the fire out; I want to burn up this trash and get it out of the ditch." Plaintiff then walked to the railroad track, near where Faherty was standing, and sat down on the end of a tie to rest, with his back to Faherty. In the meantime, efforts to put out the fire continued. After three or four minutes, Faherty finally said to plaintiff: "You have no right to build a fire here [near the bunkhouse]. I am responsible." Whereupon, plaintiff replied: "Tom, you are getting overtime for helping me burn this. What are you nagging about?" Faherty said: "I am not nagging. *Don't you ever put another fire on this ranch.*" Plaintiff then said, *"Why, I will put a fire on the ranch any time I darned please."* (Italics ours.) It was then that Faherty said to plaintiff, "You can't; you can't", and hit him over the head with the shovel.

It was Faherty's duty to control the fire, and in causing dirt to be thrown on it, he was acting within the scope of his authority. But it is noted that the final argument preceding the striking of the blow had no reference whatever to the fire then burning. It referred to something that might or might not happen in the future.

■ It is quite apparent that when plaintiff defied him as indicated, Faherty lost his temper and out of a spirit of personal animosity struck with the shovel. It is obvious that in striking the blow, Faherty was serving a purpose solely his own. His act had nothing whatever to do with a furtherance of the master's business. It was a complete departure therefrom.

Giving to plaintiff's testimony the benefit of every reasonable inference that can be drawn therefrom, it can only be said that the fire was the cause of an argument. The parties being friendly and working together, a difference of opinion arose only as to the extent to which the fire should be permitted to burn. Faherty was not trying to coerce plaintiff into assisting in putting out the fire, nor was he asking his aid in that connection. Neither was he attempting to prevent plaintiff from starting a fire, nor from adding to a fire already burning, nor was he endeavoring to eject plaintiff from the premises.

The only part the fire plays in this transaction is that it furnished a place and the cause for a battle of words. In legal effect, it would have been no different had the argument been over politics, the weather, or the merits and demerits of daylight saving time.

Faherty was serving no purpose of the defendant, real or implied, in engaging in the argument. The injury arose out of the argument, not out of anything Faherty was doing in the interests of his master.

Applying the rules of law heretofore stated to the admitted facts in this case, it is manifest that the wrongful act of Faherty was not committed within the real or implied scope of his employment, and the motion for a directed verdict in favor of defendant should have been sustained.

The judgment is affirmed.

LATOURETTE, C. J., concurring in the result.

I concur in the result reached by the majority for the reason that I have been unable to find any prejudicial error committed in the trial of the case, but I disagree with the conclusion reached that a jury question was not presented.

I am of the opinion that when the assault was made by Faherty on plaintiff he (Faherty) was an employe of the defendant, was engaged about his master's business and was not deviating from his line of duty to accomplish some personal end. I find no evidence in the record that there was any feud or personal animosity between Faherty and plaintiff; in fact, during the course of the argument over the fire up to the time of the shovel incident, the parties were laughing and joking. Everything that was done or said during and before the assault was with reference to the fire and not otherwise, and, in my opinion, Faherty at the time was acting in the line of duty and in the course and scope of his employment. Under the authorities, the fact that in so acting he assaulted plaintiff does not excuse the defendant.

In 35 Am Jur, Master and Servant, 1006, § 575, we read:

"* * * When, however, the liability of the employer to a third person for an assault committed by his employe is to be predicated solely upon the doctrine of respondeat superior, the test of liability is whether or not the servant was acting within the scope of his employment. If it can be said that the assault was within the scope of the employment, the employer will be held liable; if it is to be concluded that the employee's act was foreign to the service in which he was engaged, the employer may not be held accountable. Here, as in the case of other intentional wrongs inflicted by employees, noticeable

changes have taken place in the law governing the employer's responsibility. Formerly, the employer quite generally escaped liability for the consequences of assaults of his employees upon the theory that the acts complained of were outside the scope of the employment, even where the action was against a railroad corporation; but the modern tendency is to hold the employer accountable wherever the assault has resulted from a discharge of the duties of the service, although remotely and indirectly connected therewith.''