Argued April 10, affirmed August 14, 1962

# DAVIS *v.* WEYERHAEUSER COMPANY

373 P. 2d 985

*Harl H. Haas,* Portland, argued the cause for appellant. With him on the brief were Bailey, Swink & Gates, Portland.

*Bruce Spaulding,* Portland, argued the cause for respondent. On the brief were Mautz, Souther, Spaulding, Kinsey & Williamson, Portland.

Before McAllister, Chief Justice, and Rossman, Perry and Goodwin, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Houston Davis, from a judgment of involuntary nonsuit which the circuit court entered in favor of the defendant, Weyerhaeuser Company, upon its motion after the plaintiff had presented all of his evidence and had rested. The action was of the kind which is commonly termed personal injury. There were two defendants during the course of the trial in the circuit court. We have mentioned one of them, Weyerhaeuser. The other was a co-employee of the plaintiff by the name of Carl Johnson. Both the plaintiff and Johnson worked in the Klamath Falls plant of Weyehaeuser. The exact place where they worked was near a planer which was located in a large structure that formed a part of the mill and that housed the hard board plant. Johnson was one of those who fed material into the planer. The plaintiff, as a checker, worked in the vicinity of the planer. The plaintiff worked upon a shift that went off duty about an hour after John-

son's shift began. This appeal in no way affects the liability of Johnson. Immediately after the trial judge sustained Weyerhaeuser's motion for an involuntary nonsuit as to the plaintiff, the latter moved for judgment of voluntary nonsuit as to Johnson. The motion was allowed. Hereafter, when we employ the term "the defendant" we will refer to Weyerhaeuser.

The defendant's motion for an order of involuntary nonsuit reads as follows:

"The Defendant Weyerhaeuser moves the Court for a judgment of involuntary nonsuit against the plaintiff and in favor of Defendant Weyerhaeuser for the reason that there is no evidence sufficient to submit to the jury to establish any act of negligence alleged against Weyerhaeuser or to establish any responsibility of Weyerhaeuser on the basis of assault and battery, and there is no evidence that any act of negligence alleged against the Defendant Weyerhaeuser or any assault and battery alleged against Weyerhaeuser proximately caused any of the injuries for which plaintiff complains."

The plaintiff contends that on September 3, 1959, shortly after midnight when his shift had about completed its duties, he was squatted down near the planer in front of his tool chest and was putting his tools away preparatory to returning to his home. In describing his posture he said that he was almost sitting on his heels. According to him, Johnson approached him from the rear and without saying anything took hold of each of his shoulders and pulled him backward. He attributed no ill will to Johnson. The plaintiff cried out, "Turn me loose, you are hurting my back," and Johnson immediately righted him. The plaintiff thereupon stood up, and the oc-

currence was over. The plaintiff shortly wrote his
day's report and went home. The following day he
experienced pains and difficulties in his back. He
has not been able to return to his work since the
incident in question—September 3, 1959. December 1,
1959, he underwent surgery in an effort to improve
his condition.

The plaintiff was unable to say how far he was
pulled back, but knew that he did not fall to the floor
and that no part of his body except his feet came
into contact with the floor. He could not recall
whether Johnson, in performing the act just men-
tioned, thrust forward a knee into contact with him.

The plaintiff's single assignment of error contends
that the circuit court erred when it sustained the mo-
tion for an involuntary nonsuit which we quoted. We
will now consider it.

The complaint charged the defendant with negli-
gence in the following:

(1) Failure to furnish a safe place of employ-
ment;

(2) Failure to employ practices that were
reasonably necessary to render the plaintiff's place
of employment safe;

(3) Failure to enforce rules and do other
things reasonably essential for the protection of
the employees;

(4) "In permitting horseplay of the type en-
gaged in by the defendant, Carl Johnson, in its
said lumber and hardboard manufacturing plant,
having full knowledge of the existence of such
horseplay";

(5) "In permitting similar acts of horseplay to
take place in the presence of its foreman or other
supervisory employees in its said lumber and
hardboard manufacturing plant without taking
steps to curtail the same";

(6) "In failing to discharge * * * Carl Johnson, after acquiring knowledge of his propensity for horseplay of the type described above;"

(7) "In failing to use any care or any means whatsoever to prevent * * * Carl Johnson, from inflicting bodily harm against this plaintiff through horseplay, knowing full well of * * * Johnson's propensity for the same."

A second count of the complaint alleges:

"* * * while plaintiff and defendant, Carl Johnson were engaged in their duties for defendant Weyerhaeuser Company, defendant Johnson, in attempting to get plaintiff's attention to a matter connected with their employment, negligently grabbed plaintiff with more force than was reasonably necessary to attract his attention, causing plaintiff to be bent backwards and to sustain injuries as are more fully alleged hereafter."

The plaintiff's brief states:

"Plaintiff contends that the act of defendant Johnson which proximately resulted in plaintiff's injuries were committed in the course of his employment for defendant Weyerhaeuser and that Weyerhaeuser is vicariously liable for Johnson's act under the circumstances.

"In addition plaintiff contends that defendant Weyerhaeuser was guilty of direct negligence in several particulars in failing to prevent acts of horseplay and in failing to control or discharge defendant Johnson."

Beginning about 1948 or 1949 the plaintiff began to experience trouble with his back. He described the affliction as "soreness." Occasionally the pain troubled him sufficiently so that he lost a day or more from his work. By April 23, 1959, the condition of the plaintiff's back had deteriorated sufficiently so that he underwent surgical treatment in

an effort to improve matters. He did not return to his employment until August 10, 1959. He then felt able to do his work. As we have said, he underwent surgery again December 1, 1959, that is, after the occurence of September 3, 1959.

The plaintiff entered the employ of the defendant's Klamath Falls plant in 1949 or 1950 and remained in its employ until his injury September 3, 1959. In 1956 or 1957 he was transferred to the hardboard phase of operations; the latter were conducted in the building in which the injury occurred. About three and one-half years before the injury Johnson also went to work in the hardboard plant. The two men became acquainted. They were not ill-disposed to each other.

As is evident from the averments of the complaint that are set forth in a preceding paragraph, the plaintiff contends that the defendant permitted horseplay by its employees and thereby failed to provide him with a safe place in which to work. He also claims that Johnson's act in bending him (the plaintiff) backward was done in the course of Johnson's employment and that its purpose was to gain the attention of the plaintiff so that the two could discuss a matter pertaining to the planer.

The plaintiff asserts that when Johnson came upon him and pulled him backward Johnson had the double purpose of (1) gaining the plaintiff's attention and (2) of discussing with him the planer. In that way the plaintiff says that Johnson was acting within the scope of his employment. The contention is based solely upon an excerpt from the transcript of evidence which we will shortly quote. The entire excerpt consists of a single question which plaintiff's counsel propounded to Johnson and of the latter's answer

thereto. The excerpt represents all of the testimony that Johnson gave. Before quoting it we explain that the plaintiff does not cite anything else in support of his contention that Johnson pulled him back for the purpose of talking to him. The excerpt follows:

"Q Mr. Johnson, laying aside for the moment what your actions were towards Mr. Davis at the time that it is alleged that you came up upon him, you have claimed in your deposition that your purpose in going up to him was to get some information about the planer, how the planer was operating, is that correct?

"A Yes."

It will be noticed that Johnson did not say that he tilted the plaintiff backward for the purpose of getting information from him. The tilting backward is the crux of this case. We will presently show that Johnson did not—either before or after tilting the plaintiff backward—ask him for information concerning the planer.

The deposition which the question mentioned was not produced and we have no access to it. We are uninformed as to its contents. We do not know when the deposition was taken. The trial judge, in construing that item of evidence, declared:

"This is absolutely the only evidence in the entire case of the plaintiff that would indicate Johnson had any other purpose than to commit an act of horseplay involving an assault on Davis. Such claimed purpose is entirely inconsistent with the facts as stated by plaintiff that Johnson never asked him anything about the planer, or at least he didn't remember of any such thing. This item of evidence might be evidence tending to show that Johnson may have had some sort of an intention like this in approaching Mr. Davis, but taken in connection with all of the other evidence

of the plaintiff, does not constitute, in the Court's opinion, sufficient evidence to go to the jury, that the purpose of Mr. Johnson in grabbing Davis, as Davis claims, was to gain his attention or for any purpose other than as claimed, a deliberate act of horseplay or an act at the time entirely of his own and in no way connected with any duty or within the scope of Johnson's employment * * *."

The trial judge, as is seen from the foregoing, treated Johnson's answer to the question propounded to him (Johnson) by plaintiff's counsel as "evidence tending to show that Johnson may have had some sort of an intention like this in approaching Mr. Davis." Defendant's counsel agrees that that interpretation of the question and answer was proper. We will, therefore, adopt the same interpretation, that is, that Johnson had in mind, as he saw the plaintiff ahead of him, an intention to ask him a question about the planer. Intentions, however, can be fleeting and are subject to abandonment. It may be that the intention to ask a question was discarded when Johnson saw the favorable opportunity for a bit of horseplay.

The trial judge, as is seen from his quoted ruling, commented upon the fact that the plaintiff conceded that Johnson asked nothing about the planer after he (the plaintiff) had stood up. We, too, believe that it is significant that after the plaintiff arose from his squatting position and the two men spent a moment in conversation Johnson asked nothing about the planer. If, when Johnson touched the plaintiff, he really intended to ask the plaintiff something about the planer, it is impossible to understand why he didn't do so after the plaintiff stood up and the two spoke to each other. The plaintiff arose promptly and

did not say at that time that he was in pain or distress. Pertaining to the conversation that then took place between Johnson and himself, he testified:

"Q You don't recall him saying anything about how's the planer operating or anything like that?
"A No, I don't."

■■ We do not believe that the plaintiff presented any evidence indicating that when Johnson took hold of his (the plaintiff's) shoulders and drew him back he was acting pursuant to or within the scope of his employment. He was then doing nothing for the defendant. Restatement of the Law, Agency 2d, § 228, states:

"General Statement
"(1) Conduct of a servant is within the scope of employment if, but only if:
"(a) it is of the kind he is employed to perform;

\*       \*       \*

"(c) it is actuated, at least in part by a purpose to serve the master, and \* \* \*"

*Barry v. Oregon Trunk Railway,* 197 Or 246, 253 P2d 260. We therefore dismiss as unsupported the contention that Johnson was acting within the scope of his employment when he pulled the plaintiff backward. It is our belief that Johnson's act was purely one of horseplay.

The plaintiff called as witnesses several employees of the defendant who worked in the same structure as he and who related acts of horseplay which took place there from time to time. The building evidently was large and housed not only the planer which we have mentioned but also other machinery. One of the witnesses spoke of a motor truck that he drove in the structure; its operation in the building may indicate that the latter was sizable. We refer to the spacious-

ness of the structure because the witnesses, in mentioning acts of horseplay, did not always state the place in the building where the act occurred. If the act, such as throwing a wad of paper or pinching some one, did not take place in the general area where the plaintiff worked, it would seem that it could not have affected his safety.

Although the plaintiff had worked for the defendant longer than any of his witnesses, he mentioned no horseplay or other antics that ever occurred. He also testified that Johnson never before played any prank upon him; the following is taken from his testimony:

"Q You never had any differences or trouble of any kind with Mr. Johnson?

"A No, I didn't.

&ast; &ast; &ast;

"Q And during that time were you and Mr. Johnson associated on the job?

"A We were.

"Q And had no difficulty of any kind or nature?

"A No.

&ast; &ast; &ast;

"Q During any of the other times—during any time that you knew Mr. Johnson and during the time that he was employed by Weyerhaeuser in August of '57 until September the 3rd of '59, did Mr. Johnson ever violate your person in any way?

"A Not that I could recall.

"Q If it had happened you would recall it, wouldn't you?

"A If it was a minor incident, I wouldn't have."

One of the plaintiff's witnesses who was present when Johnson bent the plaintiff back testified that on another occasion he saw Johnson "take a long

pry bar that they use for loading cars, sharp on one end and stand back and throw it at a box * * * and I have seen him put spikes in the claws of hammers and throw it at the box." He testified that Johnson didn't throw those tools "very far." He didn't mention where the acts occurred. The plaintiff made no mention of them. It is not claimed that those acts were done in a manner that endangered anyone. They were not practical jokes but were apparently efforts of Johnson to test his marksmanship. The same witness also testified that he saw Johnson at times throw chalk at other employees. Another witness also mentioned chalk throwing. The first of those two witnesses, before the day of the trial, wrote a summary of the acts of horseplay that he had observed. The following is taken from it.

"I haven't seen any horseplay around that would amount to anything except this incident. I have not seen Carl Johnson involved in any horseplay except this incident."

By "this incident" he referred to plaintiff's injury. As a witness he testified that he made a mistake in phrasing his report in that manner, and gave the following testimony:

"Q You mean when he did say, 'I haven't seen any horseplay around that would amount to anything except this incident. I have not seen Carl Johnson involved in any horseplay except in this incident,' you said that led to it?

"A I meant to say that amounted to anything to hurt anybody.

"Q What about this same thing, 'I have not seen Carl Johnson involved in any horseplay except this incident.'?

"A That is what I said, 'that amounted to anything that hurt somebody.' "

Another witness described a bit of horseplay by a foreman which assumed the form of squaring off in feigning fashion for a fight. The witness said that the foreman was "just playing." He added that the make-believe fighter is no longer a foreman.

We have mentioned the fact that a witness spoke of a truck that he drove in the structure in which the plaintiff's injury occurred. He testified that on one occasion Johnson threw a four-by-four under it. The witness' testimony indicates that the truck was near the planer when Johnson took a four-by-four from the planer and threw it under the truck. No one testified that the truck was moving when the incident occurred or that it passed over the board.

A witness testified that he saw an occasional employee pull a tallyman backward who was sitting on his haunches counting material so that he was thrown off-balance and toppled backward. In that way he lost his count. No one claimed that any tallyman was injured in that way. We infer the loss of the count rather than the tip-over of the tallyman was the nub of the antic.

Some witnesses mentioned "goosing" and attributed a part of it to Johnson. Plainly such an act of buffoonery would be unbecoming in any gathering which observed even the amenities of society, but no one claims that it endangered anyone's safety. The fact that an employee resorted to something of a coarse nature does not establish the plaintiff's charges.

The throwing once in a while of a piece of wadded paper by one employee at another, which an employee swore occurred, could scarcely be deemed an act that endangered safety.

The above does not mention all of the acts of horseplay that the witnesses related, but it affords

an impression of their nature. No witness stated that any one, except the plaintiff, had suffered an injury from any of the antics.

Some of the witnesses described action taken by the defendant and its foremen which sought to suppress, if not end, the horseplay. The company posted in its plant a sheet of printed "Company Safety Rules" which included this:

> "Horse-play results in too many serious accidents to be allowed. Fighting, scuffling, yelling, throwing of tools or material or other boisterous conduct or practical joking is prohibited."

Another set of "Posted Company Rules" listed as cause for "immediate Discharge" any "Violation of safety rules as established by the Employer." Witnesses mentioned gatherings of employees in which foremen reiterated the defendant's attitude against horseplay. We quote the following from the testimony given by one of the witnesses:

> "Q  I see, now, in the year before September 3, 1958, before September 3, 1959, was there any meeting at which you received any instructions by the foreman about horseplay at Weyerhaeuser?
>
> "A  Yes, I have been to several of them."

One of the witnesses mentioned an employee who "was fired" because of an act of horseplay. A foreman who either participated in an act of horseplay or countenanced it was relieved of his employment. We quote the following from the testimony of another of the witnesses:

> "Q  And do you know of instances where Mr. Maxwell was successful in finding out who did any of this and was the person fired?
>
> "A  Yes, he fired one man for horseplay.

*     *     *

"Q Mr. Hamm, did your foreman have a meeting of employees on your shift from time to time?

"A Yes.

"Q At any time was the subject of horseplay taken up?

"A Yes, it was brought up to our attention that all horseplay was subject to immediate dismissal.

"Q Did you have such a talk from the foreman Maxwell and before the September 3rd, 1959, incident when Mr. Davis was hurt? When was the last time you had such a discussion on horseplay?

"A Putting it down to a definite date, it is impossible to say. But Maxwell was very strict, faithful about it, I should say, about emphasizing horseplay. He would do that quite frequently."

It may be that all of the foremen whom the witnesses mentioned did not work upon the same shift as that of the plaintiff, but all acts of horseplay that the witnesses described were not committed by men who worked on the same shift with the plaintiff. Evidently, the witnesses sought to describe the entire situation rather than limit themselves to some specific time of the day.

The foregoing completes our review of the evidence. We have omitted some details.

Section 1.15 of the Basic Safety Code, which was promulgated pursuant to authority granted by ORS 654.035, says:

"There must be no horseplay, scuffling, practical jokes or any other activity which will create or constitute a hazard."

Section 1.6 of the code provides:

" 'Shall' and 'must' are used to indicate the provisions which are mandatory."

Many of the items of horseplay mentioned by the witnesses were of a kind that could not have readily brought injury to anyone. We have in mind such acts as throwing wadded paper or pinching some one. Possibly those phases of camaraderie were bits of friendly recognition. Every act of horseplay that the witnesses described seemingly resulted from well disposed motives and not from ill will. At any rate, nothing to the contrary was claimed. If a person who is seated upon his haunches is violently pulled back to the floor by some one as a result of ill will, an injury may be sustained; but if a friend pulls another backward so as to throw him off balance, it is not likely that any one could suffer injury thereby.

■ We do not believe that the evidence above reviewed indicates that the horseplay in which the men engaged was of a character that constituted a hazard to the workmen's safety within the contemplation of our Basic Safety Code. No one testified that any employee complained to the defendant or to a foreman about the horseplay or asked that action be taken for its suppression. As we have seen, no one was injured by any of the antics until injury befell the plaintiff. But the impaired condition of his back was such that it could not withstand pressure. Mention has been made of the fact that one of the employees, after relating several items of horseplay that he had seen, testified that none of them would "hurt anybody." Still another characterized as "just play" the incident which he described.

■ If the parties to this case were subject to the Oregon Workmen's Compensation Law (ORS 656.002 through 656.824) the plaintiff would receive compensation as prescribed by that act: *Stark v. State Industrial Accident Commission*, 103 Or 80, 204 P 151.

But, our Workmen's Compensation Law does not require a claimant to establish negligence as a basis for compensation. He is required to go no further than to prove that the injury for which he asks compensation arose out of and in the course of his employment: ORS 656.202. One who seeks damages in a case such as this must establish that his injury resulted from negligence or wantonness for which the employer was responsible: *Copeland v. St. Louis-San Francisco Railway Company*, 291 F2d 119; *Sheaf v. Minneapolis St. P. & S. S. M. R. Co.*, 162 F2d 110; *Barry v. Oregon Trunk Railway*, 197 Or 246, 253 P2d 260; *Kelley v. Oregon Shipbuilding Corp.*, 183 Or 1, 189 P2d 105.

In *Newkirk v. Oregon-Washington R. R. & Nav. Co.*, 128 Or 28, 273 P 707, and in *Cook v. Kinzua Pine Mills Co.*, 207 Or 34, 293 P2d 717, this court quoted approvingly the following which it took from 39 CJ 1292, § 1487:

> "The rule laid down by earlier decisions both in England and in many of the United States is that the master is not liable for damages resulting from the willful, wanton, or malicious acts of his servant unless done by his express direction or with his assent, although the act was committed within the line of the servant's duties. But now in almost all jurisdictions it is well settled that the master is liable for the willful or malicious acts of the servant done in the course of his employment and within its scope, although the acts were not expressly ratified by the master or authorized by him. Such acts are imputable to the master under the doctrine of *respondeat superior,* and in accordance with general principles heretofore discussed the master will be liable, although the acts were in disobedience of express orders or instructions given by him, or although the particular act complained of may have been in excess of the

servant's authority, and regardless of the motive or intention of the servant. It has been held, however, that if the nature of the act is such as to render it doubtful if the act comes within the scope of the servant's employment, the intention with which the act is done may be considered in determining its character." See, also, 57 CJS, Master and Servant § 572.

In both the Newkirk and the Cook cases the scope of employment of the tortious employee included performance of the act which brought about the injury. In the case now before us the scope of employment did not include the horseplay which caused the plaintiff's injury.

We quote the following from *Cook v. Kinzua Pine Mills Co.*:

"Defendants rely upon Barry v. Oregon Trunk Railway, 197 Or 246, 253 P2d 260, as authority for the proposition that a master is not liable for an assault and battery by his servant. We are satisfied with that decision, but the facts there indicated that the assault was the result of a personal quarrel, and as we said, 'in striking the blow, Faherty was serving a purpose solely his own.' The case is clearly distinguishable."

But the Barry decision is not distinguishable upon that basis from the one now at bar. Johnson, like Faherty in the Oregon Trunk Railway case, "was serving a purpose solely his own." Faherty intended to inflict some injury. Johnson did not. He wished to do nothing except engage in levity.

We take the following from Restatement of the Law, Torts, § 317:

"A master is under a duty to exercise reasonable care so to control his servant while acting outside the course of his employment as to prevent

him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

"(a) the servant

"(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

"(ii) is using a chattel of the master, and

"(b) the master

"(i) knows or has reason to know that he has the ability to control his servant, and

"(ii) knows or should know of the necessity and opportunity for exercising such control."

Comment c following the statement of the rule just quoted declares:

"There may be circumstances in which the only effective control which the master can exercise over the conduct of his servant is to discharge the servant. * * *"

It will be observed that the rule written by the Restatement requires evidence that the master "knows or should know of the necessity and opportunity for exercising such control."

In *Kelley v. Oregon Shipbuilding Corp.*, 183 Or 1, 189 P2d 105, the defendant had in its employ a workman by the name of Archer who is described in the decision as "most vicious and brutal known about the plant as 'onery' and quarrelsome." The plaintiff was Archer's superior, but when it developed that Archer would not obey the plaintiff's orders, the defendant, upon the plaintiff's request, discharged him. Archer thereupon, amid the use of profanity, threatened the plaintiff and said, "I'll stomp the hell out of you." Although Archer was discharged in that manner the defendant at once re-employed him, but for work in

a different part of its yard considerably removed from the area where the plaintiff worked. Two months later while the plaintiff was engaged in the performance of his duties upon the defendant's premises Archer assaulted and beat him. The jury's verdict was in favor of the plaintiff. The trial judge entered judgment for the defendant notwithstanding the verdict. In sustaining that judgment our decision declared:

> "It is well settled that an employer is liable in damages if an employee is injured as a result of an assault and battery by a fellow employee known by the employer to have such vicious and dangerous propensities as to constitute a hazard to fellow workers. * * *
>
> *      *      *
>
> "We agree with appellant that if an employer knew, or ought to have known, that one of his employees had such vicious and dangerous propensities that he would probably injure some co-worker, such employer would be liable by retaining such worker. We do not mean to hold that it is the duty of an employer to investigate at his peril the cause of every personal grievance of employees. An employer is only required to act in keeping with the standard of care that would have been exercised by ordinary cautious and prudent employers under similar circumstances.
>
> *      *      *
>
> "The precise questions are: Did the defendant fail in its duty to exercise reasonable care to protect the plaintiff against Archer? Did the defendant have reasonable grounds to believe when it retained Archer in its employ that he would do bodily harm to the plaintiff?
>
> "When Archer was discharged, the plaintiff said that Archer, in the presence of the foreman, Leonard Thielke, thus threatened him: 'You old son of a bitch, I'll stomp the hell out of you.'

Thielke denied hearing any threat. We will assume, however, that such threat was made and that the knowledge thereof was imputed to the employer. At the time of the attack, plaintiff was engaged in work on the premises of the defendant. About two months prior to the attack, the plaintiff had caused Thielke to discharge Archer because the latter would not obey orders. Archer was known about the plant as 'onery' and quarrelsome. Archer was a rough talker and inclined to be a 'bully.' However, the attack in question is the only one in which he was involved with any employee. There is no evidence of any other threat made by Archer, the knowledge of which could be imputed to the defendant employer. There is no evidence of Archer having a reputation for being vicious or dangerous. It will be recalled that the attack occurred two months after the threat was made. No trouble arose during the interval."

■ In the case now at bar we have declared that the acts of horseplay were not of a kind that endangered anyone's safety and we quoted from witness's testimony that he saw nothing done by Johnson that was harmful.

We do not believe that the circuit court erred when it sustained the defendant's motion for an order of involuntary nonsuit.

Affirmed.